454 A.2d 928

**EZY PARKS, et al., Appellees,**

**v.**

**Thomas D. LARSON, et al., Appellants.**

Supreme Court of Pennsylvania.

Argued May 17, 1982.

Decided Dec. 22, 1982.

Reargument Denied Feb. 8, 1983.

616

Andrew H. Cline, Asst. Counsel, Dept. of Transportation, Harrisburg, for appellants.

Michael Sklaroff, Katherine E. Knox, Stanley M. Shingles, Philadelphia, for appellees.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

OPINION

HUTCHINSON, Justice.

This is an appeal from the Commonwealth Court's order of August 28, 1982 continuing a preliminary injunction after hearing. The injunction had been granted originally without a hearing on June 10, 1981. The order, per Judge Craig, restrained appellants Pennsylvania Department of Transportation (PennDOT) and its agents and employees from:

(1) [T]erminating [appellees] leases . . . [with Penn-DOT], (2) expropriating improvements which [appellees] have made on those premises, (3) making any award of contracts or leases pursuant to the bidding and bid-opening procedures to be held June 11 and 12, 1981, and (4) entering into any new leases for any or all of said premises with any parties other than [appellees].

We find that the Commonwealth Court had reasonable grounds for enjoining the award of contracts or leases under the particular bid specifications prepared by PennDOT. However we are constrained to hold that it abused its discretion in exercising its equitable powers to enjoin Penn-DOT from terminating its leases with appellees, claiming appellees' improvements, or entering into leases with parties other than appellees because appellees have an adequate and exclusive remedy at law against that harm. We therefore affirm, in part, and reverse, in part, the order of the Commonwealth Court.

I

The standard of review on appeal from the grant of a preliminary injunction was recently recited by this Court in *Shenango Valley Osteopathic Hosp. v. Dept. of Health,* 499 Pa. 39, 50, 451 A.2d 434, 439 (1982) (quoting *Bell v. Thornburgh,* 491 Pa. 263, 267–268, 420 A.2d 443, 445 (1980)).

As a preliminary consideration, we recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that *no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied* will we interfere with the decision of the Chancellor. *Intraworld Inc. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975); *Credit Alliance Corp. v. Philadelphia Minit-Man Car Wash Corp.,* 450 Pa. 367, 301 A.2d 816 (1973); *Zebra v. Pittsburgh School District,* 449 Pa. 432, 296 A.2d 748 (1972). "In order to sustain a preliminary injunction, *the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted.*" *Zebra v. Pittsburgh School District,* 449 Pa. at 437, 296 A.2d at 750. (emphasis added). *Roberts v. School District of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975). (emphasis added). Moreover, the determination as to any apparently reasonable grounds must be predicated upon our independent examination of the record. *Shenango Valley,* 499 Pa. at 450–451, 451 A.2d at 440 (citing *Singzon v. Department of Public Welfare,* 496 Pa. 8, 436 A.2d 125 (1981).

Viewed under that standard, the facts are as follows. PennDOT leases portions of its right-of-way along Vine Street in Philadelphia to appellees who operate parking lots on the premises. Appellee Ezy Parks, Inc. leases nine separate properties from PennDOT. It entered into the earliest lease with PennDOT in 1973 its most recent in 1977. The remaining seven appellees each lease a single property. Their earliest lease dates back to 1971, while their most recent was obtained on June 1, 1980. Each lessee entered into a standard lease agreement with PennDOT which included a clause providing that "either party may terminate this agreement on thirty (30) days written notice to the other party." Pursuant to PennDOT's policy and procedure

requiring bi-annual appraisal of "all rental properties", those in question were periodically appraised and the rental rates accordingly increased.

An officer of appellee Garden Parking testified that he told PennDOT officials, Mr. DeFelice and Mr. McQue, subsequent to signing his initial lease, that he didn't see how he could "stay on a month-to-month lease and still make the investments necessary to meet the regulations and requirements of the Licenses and Issuance Department of the City of Philadelphia." He further testified he was told by Mr. DeFelice and Mr. McQue that "until we need it [his parking lot] for Vine Street you're all right." Based on this representation and subsequent conversations with Mr. DeFelice and Mr. McQue, he made improvements to his lots which he claims cost him ·in excess of $20,000.00.[1] An officer of Independence Hall Parking Lots, Inc. testified that he had made substantial improvements costing in excess of $60,000.00 following representations from Mr. DeFelice and Mr. McQue that he "would be there" from five to seven years or longer because the State did not have money to proceed with the Vine Street project. An officer of Ezy Parks testified his company made valuable improvements to seven lots leased from PennDOT based on assurances from George Bristol and Dan Miller from PennDOT's District Office. The parties stipulated that the remaining appellees would testify to the effect that they made substantial improvements based on the representations of PennDOT officials that the lease would last until the premises were needed for construction of the Vine Street Expressway.[2]

1. The nature of the improvements to the lots were generally described by PennDOT's witnesses as temporary buildings for the lot attendants, bumper blocks, ticket splitters, peripheral boundaries (concrete walls or blocks) and macadam. There is a factual dispute as to the value of the improvements.

2. PennDOT introduced testimony to the effect that one of the tenants received credit for improvements as part of a negotiated settlement for back rent. Moreover, with respect to those tenants who were in possession at the time of condemnation, PennDOT maintains the tenants had been reimbursed for improvements that existed at the time of condemnation.

Mr. John Felice testified that from 1970 through 1978 he was the property manager for PennDOT. He confirmed that he had made representations to some of the tenants that their leases would be continued until the properties were needed for the Vine Street Expressway, that he was given permission to do so by his superiors on the right-of-way staff and that such representations were consistent with PennDOT policy. It was stipulated that Joseph McQue, a real estate specialist in property management from 1966 to 1978, had personal contact with many of the tenants. He represented to the lessees that until PennDOT needed their properties for construction of the Expressway, they would be entitled to lease them. Mr. McQue understood that he was authorized to make such representations to the lessees.

On May 14, 1981 David C. Sims, Deputy Secretary for Highway Administration, advised each tenant that his lease would be terminated and new leases awarded by competitive bidding.[3] On May 31 the Department published advertisements inviting public bidding for the leases in question and scheduled opening for June 12, 1982. The bid instructions issued by PennDOT stated:

(t)hat the bid would be for land only, and that all personal property on the premises is assumed to be owned by the present occupant, whether the same be personalty, improvements to the land, or trade fixtures. However, as between PennDOT and present occupant, PennDOT reserves the right to take the position that certain items affixed to the premises are permanent improvements and therefore, the property of PennDOT.

By these specifications, Deputy Secretary Sims, a PennDOT official who authorized the bidding, said he intended to invite bids on improved lots. He interpreted the bid instruc-

3. The record shows the decision to terminate the leases and to seek competitive bids was made after a phone call from the Governor's office calling to Deputy Secretary Scheiner's attention an earlier Auditor General's report that the properties were undervalued. The record also shows the notice and issuance of the bid forms was expedited at the direction of PennDOT officials in Harrisburg.

tions to mean paving and other improvements would be included and pass to the high bidder as part of the land but admitted the bid instructions were unclear on this point.[4] The District Six Right-of-Way Administrator charged with administering the bidding process testified he believed that *all* of the appellees' improvements belonged to the Commonwealth and that the successful bidder would be entitled to these improvements without additional charge. However, PennDOT's Chief of the Right-of-Way Division testified it is the Department's position that the *only* improvements which belong to the Commonwealth are macadam.

With this factual background we proceed to consider the issues raised by appellants and turn first to the propriety of that portion of the Commonwealth Court's Order enjoining the award of contracts on PennDOT's bid specifications.

## II

We note appellants do not directly attack the Commonwealth Court's jurisdiction to consider that portion of appellees' complaint seeking to enjoin the awarding of bids on these specifications by Commonwealth officials. Such suits do not fall within the "exclusive jurisdiction" of the Board of Claims which is authorized to "determine all claims against the Commonwealth arising from contracts hereinafter entered into with the Commonwealth where the amount in controversy exceeds $300.00 or more."[5] Our first inquiry then is whether there are "any reasonable grounds" supporting the Commonwealth Court's Order enjoining the award of bids. The purpose of bidding requirements was summarized by this Court in *Yohe v. Lower Burrell,* 418 Pa. 23, 28, 208 A.2d 847, 850 (1965).

4. Deputy Secretary Sims took the position that a prudent bidder would inquire of the District Office's property management supervisor on the meaning of the instructions and if an answer was not forthcoming he would go to that official's superior and ultimately, if he did not receive an answer, to the Secretary of Transportation.

5. Act of October 5, 1978, P.L. 1104, No. 260, § 3, 72 P.S. § 4651–4.

Bidding requirements "are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts and to secure the best work or supplies at the lowest price practicable, and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." (Footnotes omitted.) 10 McQuillan, *Municipal Corporations* § 29.29, at 266–67 (3rd ed. 1950).

When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, judicial intervention is proper. *American Totalisator, Inc. v. Seligman,* 489 Pa. 568, 576, 414 A.2d 1037, 1041 (1980).

The integrity of the competitive bidding process is violated and the purpose of competitive bidding is frustrated where there is no common standard on which bids are based.

A fair opportunity must be afforded for free competition. Inherent in competitive bidding is the requirement that the public body shall prescribe a common standard on all matters that are material to the proposals, to the end that interested persons may bid intelligently and will be induced to bid by the promise of impartiality. No scheme or device promotive of favoritism or unfairness or which imposes limitations, not applicable to all bidders alike, will be tolerated. These fundamental rules have been announced and applied in a multitude of cases.

10 McQuillan, *Municipal Corporations* § 29.29, at 302 (revised 3rd ed. 1981) (footnotes omitted). *See also Douglass v. Commonwealth,* 108 Pa. 559, (1885); *Addis v. Pittsburgh,* 85 Pa. 379 (1877). This Court has held in the context of competitive bidding for needed goods or services designed to obtain the lowest possible cost for a public works project that:

The term "lowest bidder" implies a common standard under which all bids may be received. That common standard implies previously prepared specifications, freely

accessible for all competitors; on these alone shall their bids be based: *Mazet v. Pittsburgh,* 137 Pa. 548 [20 A. 693]; *Edmundson v. Pittsburgh School Dist.,* 248 Pa. 559, 562 [94 A. 248]. . . . [I]f the bidders are misled by anything which the board may have done, or the notice may have required, the bidding was not on a common basis; the lowest figures submitted would not, in law, be the lowest bid, because it lacked fair competition.

*Page v. King,* 285 Pa. 153, 156–157, 131 A. 707, 708–709 (1926) (material changes in specifications not published). *See also, American Totalisator Co., Inc. v. Seligman, supra;* (ambiguity as to whether bids for computerized daily numbers game were to be calculated on effective rate or accumulative rate basis). *Accord Lutz Appellate Printers v. Commonwealth,* 485 Pa. 559, 403 A.2d 530 (1979) (limitations against out-of-state bidder from state not hostile to out-of-state concerns). We see no reason why the same rationale should not apply where the purpose is to secure the highest price for Commonwealth realty which is available for lease. In either case, where, as here, there is ambiguity in the bid instructions, potential bidders, exercising reasonable caution, would reduce their bids in order to adjust for ambiguous instructions.

■ Additionally, the testimonial record before us shows there is a substantial likelihood that PennDOT intends to include the improvements to the lots in question in its new leases without additional charge to the high bidders. If so, the high bidders stand to obtain the benefit of valuable improvements not clearly or specifically included in the specification on which they prepared their bids. Hence, the receipt of these improvements represent a potential windfall to the high bidders to the double expense of the Commonwealth if appellees successfully pursue their statutory remedy. Moreover, bid instructions which do not provide a common basis cannot be clarified on an *ad hoc* basis by *ex parte* explanations from officials of a public body to those potential bidders who are either clever enough to seek such advice or who simply, for whatever reason, have special

access to the ears of PennDOT officials.[6]  Finally, the bid instruction virtually precluded appellees from entering meaningful bids.

> Submitting bids which would include the value of the improvements that have already been paid for would put them [appellees] in the position of paying for those items twice.  Entering bids which would not include that value would decrease their chances of being awarded the leases because competitors might well be including the value of those permanent improvements which would customarily go with the land.

Commonwealth Ct. Slip Op. at 2 (filed November 2, 1982).

We recognize PennDOT issued its bid instructions in the context of an unresolved dispute between PennDOT and appellees.  Thus, the drafting of clear instructions creating a common standard may have been difficult.  However, the uncertainty surrounding the ownership of the improvements to the lots in question does not excuse the use of hopelessly vague bid instructions.

> If the kind or amount of work or material which a municipal corporation will require under a contract is indefinite, the advertisement for bids thereon should contain sufficient information concerning the work or material to enable bidders intelligently to calculate their bids, and freely and openly to compete upon a basis of equality.

McQuillan, *supra*, § 29.66 at 378.  PennDOT could have limited much of the confusion surrounding the bidding of this project by providing for alternate bids which would account for the various contingencies which may result from the dispute over the ownership of improvements between PennDOT and appellees.[7]

---

**6.** In any case, the record demonstrates that any efforts to clarify the meaning of the concededly ambiguous bid instructions would have resulted in further confusion.  Not only were potential bidders uncertain as to the meaning of PennDOT's instructions but it appears the PennDOT officials were equally confused.

**7.** Alternative bids could serve the added function of providing a basis for assessing the fair market value of the improvements made to the lots by appellees.

■ Appellants' claim that appellees lack standing to enjoin the award of contracts or leases pursuant to the bidding procedures announced by PennDOT is without merit. This Court recently reaffirmed a taxpayer's standing to enjoin the improper award of a public contract, holding such standing is not defeated by the fact that the complaining taxpayer is also a disappointed bidder. *American Totalisator Co., Inc. v. Seligman, supra; Lutz Appellate Printers v. Commonwealth, supra.*

Based on the foregoing, we conclude the Commonwealth Court had reasonable grounds for enjoining the award of bids on these specifications.

### III

■ Having held the Commonwealth Court properly enjoined the award of bids, we next consider the question whether it properly enjoined PennDOT from terminating its leases with appellees. On this issue we again refer to the Act of October 5, 1978, *supra,* note 5 at p. 932, which gives the Board of Claims *"exclusive* jurisdiction to hear and determine all claims against the Commonwealth arising from contracts where the amount in controversy exceeds $300.00 or more." (Emphasis added).[8] A lease is in the nature of a contract and is controlled by principles of contract law. *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979).

■ With respect to the limitations the legislature imposed in creating the Board of Claims we recently said:

"The Board of Arbitration of Claims can award monetary damages for breach of contract. The legislature has provided in accordance with its power under Art. 1, Sec. 11 of the Pennsylvania Constitution, that all claims against the Commonwealth arising from contracts shall be

8. Prior to the Act of October 5, 1978 the predecessor to the Board of Claims, the Board of Arbitration, had jurisdiction to hear and decide such·claims against the Commonwealth. Act of May 20, P.L. 728, No. 193, § 4, *as amended.* By the Act of October 5, 1978 the legislature expressed its intention that the Board of Claim's jurisdiction be "exclusive".

heard by the Board of Arbitration of Claims. This Board has exclusive jurisdiction of contract claims pursuant to the Act of May 20, 1937. The Act created a special forum, specified the nature of claims to be considered [claims of or over three hundred (300) dollars] and limited the remedy to monetary damages. *Vespaziani v. Dept. of Revenue.* 40 Pa.Cmwlth. 54, 396 A.2d 489 (1979); *Brocker Mf. & Supply Co., Inc. v. United Bonding & Insurance Company,* 8 Pa.Cmwlth. 110, 301 A.2d 438 (1973). With the passage of the Commonwealth Court Act, and the creation of that court's jurisdiction, the legislature carefully provided that the jurisdiction of the newly created court would not repeal, modify or supplant the jurisdiction of the Board. When the ban imposed by the common law doctrine of sovereign immunity was abrogated, to clarify the Commonwealth Court's power to intervene in these matters with equitable relief, the legislature modified Section 4651 (72 P.S. § 4651–4) by inserting the word 'exclusive' to emphasize that only the Board should hear these matters."

*Emergency Medical Services Council of Northeastern Pa., Inc. v. Dept. of Health,* 499 Pa. 1, 7–8, 451 A.2d 206, 209 (quoting *Clark v. Pennsylvania State Police,* 496 Pa. 310, 314, 436 A.2d 1383, 1385 (1981). The exclusive remedy of monetary damages in the Board of Claims constituted a limited waiver of sovereign immunity.[9] Had it not been for the

9. 1 Pa.C.S. § 2310 (1978) provides:
Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) *unless otherwise specifically authorized by statute.*
(Emphasis added). The only statute specifically authorizing an action on appellees' claim for breach of their leases is the Act of October 5, 1978, *supra,* creating the Board of Claims and setting forth its limited jurisdiction.

legislative authorization of contract suits against the Commonwealth appellees would have been unable to sue the sovereign for breach of contract.[10]  *See Smock v. Commonwealth,* 496 Pa. 204, 210, 436 A.2d 615, 618.  Thereafter, the legislature inserted the word "exclusive" to assure that only the Board should hear contractual matters involving the Commonwealth and to clarify its jurisdiction *vis a vis* the Commonwealth Court.  This remedy is adequate.  *See Clark v. Pennsylvania State Police,* 496 Pa. at 314, 436 A.2d at 1385.  Consequently the Commonwealth Court may not intervene in matters involving contractual disputes between the Commonwealth and its lessees by providing injunctive relief against a wrongful termination.  *See Emergency Medical Services, supra.  See also Clark v. Pennsylvania State Police, supra.*  Of course, we do not intimate that the legislature can deprive equity of jurisdiction and limit the remedy to only monetary damages in all cases, including those where a fundamental constitutional right for which such damages would be inadequate was irreparably threatened.  We simply follow *Emergency Medical Services* and *Clark v. Pennsylvania State Police* in holding that the opportunity to obtain monetary relief in the Board of Claims for interference with their contract right is adequate.

## IV

■ Appellees' assertion that the Commonwealth Court

10.  Appellees argue that the Board of Claims' jurisdiction over cases involving wrongful termination of their leases is not "exclusive" despite the wording of the statute because the Pennsylvania Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, Art. IV, 26 P.S. § 1–101, *et seq.,* provides another forum in Common Pleas to remedy wrongful termination of a lease between the Commonwealth and its lessee.  We find no authority for the proposition that the termination of a lease by the Commonwealth constitutes a "taking" under the Eminent Domain Code as opposed to an action for damages based upon a breach of contract.  The Eminent Domain Code only provides for an apportionment of damages between a lessor and the owner of the fee where the Commonwealth takes, injures or destroys private property.  The easements in question here, previously were taken, are public property and the lessees rights are strictly contractual.

had "pendent jurisdiction" [11] over the causes of action on their leases, based on the Commonwealth Court's proper exercise of jurisdiction regarding the bid procedures, must likewise fail. In Part III of this opinion we hold the exclusive statutory remedy for a breach of a lease is for monetary damages in the Board of Claims and that such remedy is constitutionally adequate. In raising what they call "pendent jurisdiction" appellees rely on our cases refusing to apply the doctrine of deferral to administrative expertise, or primary jurisdiction. *See Feingold v. Bell of Pennsylvania,* 477 Pa. 1, 383 A.2d 791 (1977). The doctrine of primary jurisdiction provides that courts will refer determination of an issue within an agency's area of expertise, necessary to apply a recognized common law remedy, to the agency and defer action until the agency decides that issue even where the statute does not entrust that issue "exclusively" to the agency. *See Elkin v. Bell Tel. Co. of Pennsylvania,* 491 Pa. 123, 132, 420 A.2d 371, 376 (1980) (citing *Weston v. Reading Co.,* 445 Pa. 182, 282 A.2d 714 (1971)). Appellees' reliance on *Feingold's* exception to the doctrine of primary jurisdiction is misplaced because primary jurisdiction has nothing to do with this case.

Here the Commonwealth Court was expressly deprived of all jurisdiction over contract disputes with the Commonwealth in favor of the Board of Claims, including concurrent and pendent jurisdiction where, as here, the administrative remedy is adequate. By statute the Board of Claims has exclusive jurisdiction to provide an exclusive remedy, i.e. monetary damages. Thus, doctrines relating to concurrent, pendent or primary jurisdiction, such as the maxim that equity delights to do justice and that not by halves, are of no help to appellees.

### V

Finally, we hold that the Act of December 7, 1979, P.L. 478, No. 100, does not give these lessees a property

---

11. Appellees' argument might be more correctly raised in terms of concurrent jurisdiction.

interest in their leases sufficient to otherwise justify equitable relief. Act 100 authorized PennDOT, for the first time, to acquire land in fee simple for all transportation services. *See* 71 P.S. § 513(e)(1). Under prior law the relocation of state highways was accomplished exclusively by condemnation of an easement. *See* State Highway Law, Act of June 1, 1945, P.L. 1242, art. II, § 210, *as amended,* 36 P.S. § 670–210.[12] Act 100 only authorizes PennDOT "to acquire the fee underlying any easement previously acquired by the department." 71 P.S. 513(e)(2((b)(iii). It does not convert a previously acquired easement into a fee. In addition to authorizing PennDOT's acquisition of land for state highways in fee simple, Act 100 provides that: "Any other provisions of this act to the contrary notwithstanding, the department *may* sell at public sale any land acquired by the department if the secretary determines that the land is not needed for present or future transportation purposes." 71 P.S. § 513(e)(7) (emphasis added). The statute further provides a type of first refusal option for a tenant of improved lands as follows:

> *Improved land* occupied by a tenant of the department shall first be offered to the tenant at its fair market value as determined by the department, except that if the tenant is the person from whom the department acquired the land, it shall be offered to the tenant at the acquisition price, less costs, expenses and reasonable attorneys' fees incurred by the person as a result of the acquisition of the land by the department.

71 P.S. § 513(e)(7)(i) (emphasis added).

Appellees assert that the Commonwealth Court correctly held these provisions of Act 100 giving a tenant on improved land a right of first refusal create inchoate property rights

---

**12.** Neither section 402 of the Eminent Domain Code, 26 P.S. § 1–402 nor the special provisions of the State Highway Law relating to acquisitions for highway purposes in Philadelphia and Pittsburgh, 36 P.S. §§ 670–541 *et seq.* change the nature of the interest acquired. Furthermore, appellees have produced no evidence to show that the Commonwealth's interest in the leased premises was any more than an easement.

entitled to specific performance which can be protected only by equity. We disagree. The Commonwealth's interest in the Vine Street Expressway was acquired by it under prior statutes limiting its interest to an easement for highway purposes. Appellees asserted inchoate rights can only ripen into a property interest upon abandonment by the Commonwealth. Upon such abandonment the easement terminates and the Commonwealth is left with nothing to sell. Serious constitutional questions would arise were we to decide that Act 100 transferred the rights granted to adjoining property owners under section 3 of the Act of February 27, 1849, P.L. 90, 36 P.S. § 2131 on abandonment of an easement, to persons granted leases on the right-of-way. Moreover, we are not inclined to decide that Act 100 requires the Commonwealth to purchase or otherwise acquire the rights of the residual fee owners in cases such as this where the taking was properly limited to an easement under the law then in effect. The inchoate property right these appellees claim under Act 100 belongs to others upon abandonment for highway purposes, the very event they say causes it to ripen. Consequently, we hold the rights accorded PennDOT's lessees under Act 100 apply only in cases in which PennDOT has acquired a fee. It has no application to cases involving easements for highway purposes. Therefore, appellees have no Act 100 rights subject to equitable protection.

That portion of the Commonwealth Court's Order of August 28, 1982 continuing the preliminary injunction against awarding contracts pursuant to the bidding and bid opening procedures to be held on June 11 and 12, 1981 is affirmed. The Order of August 28, 1982 in all other respects is reversed and vacated and the cause is remanded for further proceedings consistent herewith.

LARSEN, J., concurs in the result.

McDERMOTT, J., did not participate in the consideration or disposition of this case.