# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allan Myers, L.P., : 
        Petitioner : 
     : 
    v. : No. 314 C.D. 2018
     : Argued: October 17, 2018
Department of Transportation, : 
        Respondent : 

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ROBERT SIMPSON, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT              FILED: January 11, 2019

      At issue in this appeal is the Department of Transportation's (PennDOT) inclusion of a requirement in a bid solicitation for a highway construction project that the winning bidder execute a project labor agreement (PLA). Allan Myers, L.P., a nonunion construction company, petitions for review of the order of the Secretary of Transportation dismissing its protest to the PLA requirement in the bid solicitation. The Secretary held, *inter alia*, that the PLA did not violate Pennsylvania's competitive bidding laws. For the following reasons, we reverse.

## Background

      For some time, PennDOT has been making improvements to Markley Street, which is State Route 202 in Montgomery County (Markley Street Project). A nonunion contractor, J.D. Eckman, Inc., won the bid for the first phase of the Markley Street Project and completed it a year ahead of schedule and on budget.

Reproduced Record at 349a (R.R. __). In August 2017, PennDOT issued a bid solicitation for the second phase of the Markley Street Project. The solicitation provided that all contractors were required to sign a PLA with the Building and Construction Council of Philadelphia and Vicinity (Building and Construction Council), which represents 11 local unions identified in the PLA (Local Unions).[1] The PLA obligated bidding contractors to hire craft labor personnel through the Local Unions and to be bound by the Local Unions' collective bargaining agreements. In response, multiple contractors, both union and nonunion, filed taxpayer lawsuits, bid protests, and petitions for preliminary injunction. PennDOT withdrew its August bid solicitation.

On December 20, 2017, PennDOT issued another bid solicitation, which also required contractors to sign a PLA with the Building and Construction Council. The PLA again obligated contractors to hire through the Local Unions in accordance with the terms of their collective bargaining agreements. The December bid solicitation differed from the August bid solicitation in one key respect: the PLA provides that if the successful bidder already has a collective bargaining agreement with United Steelworkers, that bidder was not subject to the hiring requirements under the PLA and permitted to use its United Steelworkers workforce.[2]

Specifically, the PLA states in pertinent part:

---

[1] These Local Unions, representing various crafts, are Bricklayers & Allied Craft Workers #1, Carpenters Regional Council, Cement Masons Local #592, IBEW Local Union #98, Iron Workers Local Union #401, Iron Workers Local #405 (Rod Setters), International Union of Operating Engineers Local #542, Laborers District Council, Painters District Council #21, Plumbers Local #690, and Teamsters Local #107.

[2] On January 6, 2017, PennDOT submitted a request to the Federal Highway Administration seeking its approval to utilize a PLA on the Project. The Federal Highway Administration approved the request. Notably, the PLA approved was the one PennDOT used in its August bid solicitation, which did not contain the provision exempting United Steelworkers contractors from the hiring requirements under the PLA.

2

Article I: SOURCING RELIABLE CRAFT LABOR

\*\*\*

[Section 3-E]. Unless otherwise specified in this Agreement, the Project Contractor shall be bound by the terms of the Local Union Collective Bargaining Agreements included as Appendix B hereto ("Local Agreements"), and any successor agreements or amendments thereto….

[Section 3-F]. All craft labor personnel employed on the Project, whether by the Project Contractor or other entities, shall be hired through the Local Unions identified in this Agreement, and in accordance with the hiring procedures of Local Agreements, included as Appendix B hereto.

[Section 3-G]. All Parties shall respect the sanctity of Local Agreements, which shall control wages, benefits, hiring procedures and other terms and conditions of employment, unless otherwise specified in this Agreement.

[Section 3-H]. In the event that a contractor bound by a Collective Bargaining Agreement (CBA) with the United Steelworkers (USW) is the successful bidder, the contractors will be permitted to utilize its USW workforce and its USW CBA[3] provided that the contractor adheres to the conditions and economic terms of the Agreement excluding any hiring hall obligations or union security provisions. And provided further that the USW contractor is either a protected contractor, under the terms of the Harmony Agreement of February 24, 1994 or has been organized by USW pursuant to paragraph 3(b) of the Harmony Agreement for at least 120 days prior to the issuance of any bid specification for the Project and provided that it normally performs the type of work being let in the geographical area of the project.

\*\*\*

---

[3] Although mentioned in the PLA, United Steelworkers' collective bargaining agreement is not included as an appendix to the PLA.

3

Article VI: CONFLICT AVOIDANCE PROCEDURES

Section 1: No Strikes-No Lock Outs. The Parties recognize that the timely planning and execution of this Project is critical and, therefore, agree that there shall be no lock-outs by Project Owner or the Project Contractor. The Unions agree that there will be no strikes or other work stoppages, provided that in the event a Local Union collective bargaining agreement expires during the course of this Project, the Project Contractor agrees to retroactive application of the terms of the new collective bargaining agreement entered between the affected Local Union and its signatory contractors.

R.R. 25a, 27a-28a, 32a (emphasis omitted). The PLA states that "[t]ime is of the essence for the Project" and that "any qualified contractors may bid or perform work on this Project, regardless of whether or not they are affiliated with the [Building and Construction Council] or its Local Unions." R.R. 25a-26a.

On December 27, 2017, Allan Myers filed a bid protest, asserting that the PLA was "unlawful and arbitrary," and it requested PennDOT to reissue the bid solicitation without the PLA requirement. R.R. 2a. The bid protest challenged the PLA as discriminatory because it effectively precludes nonunion contractors from bidding and unduly favors contractors affiliated with United Steelworkers. A report prepared for PennDOT by Keystone Research Center (Keystone Report) recommended the use of the PLA. The bid protest challenged the Keystone Report because it did not use "objective data" and was "inherently biased." R.R. 6a-7a. Finally, the bid protest asserted that the use of the PLA violates Section 404.1 of the State Highway Law,[4] which requires PennDOT to qualify bidders using statutory

---

[4] Act of June 1, 1945, P.L. 1242, *as amended*, added by Section 1 of the Act of September 20, 1961, P.L. 1529, 36 P.S. §670-404.1.

criteria. A bidder's union affiliation, or its willingness to sign a PLA, is not a qualifying factor under Section 404.1 of the State Highway Law.

PennDOT filed a response, asserting that case law precedent has authorized the use of a PLA in bids for public construction projects. Because the PLA provides that "any qualified contractors may bid or perform work on this Project" regardless of their union affiliation or lack thereof, PennDOT contended that Allan Myers could bid on the Markley Street Project. R.R. 26a. PennDOT relied on the Keystone Report, which stated that a PLA is a useful way to address labor shortages. PennDOT argued that the PLA did not violate Section 404.1 of the State Highway Law because PennDOT has discretion to decide "the particular contractual terms and conditions under which PennDOT is to purchase the labor, materials and services[.]" PennDOT Response at 12; R.R. 459a.

By a final determination dated February 26, 2018, the Secretary of Transportation dismissed Allan Myers' bid protest. Relying on this Court's decisions in *A. Pickett Construction, Inc. v. Luzerne County Convention Center Authority*, 738 A.2d 20 (Pa. Cmwlth. 1999) (*Pickett*); *Sossong v. Shaler Area School District*, 945 A.2d 788 (Pa. Cmwlth. 2008) (*Sossong*); and *Glenn O. Hawbaker, Inc. v. Department of General Services* (Pa. Cmwlth., No. 405 M.D. 2009, filed December 1, 2009) (unreported single judge opinion) (*Hawbaker*), the Secretary held that the PLA was not discriminatory because nonunion contractors are free to bid on the Markley Street Project. The Secretary concluded that the PLA does not favor United Steelworkers contractors because they are bound by the same terms and conditions of the PLA as all other contractors. The Secretary observed that the purpose of Section 3-H of Article I of the PLA is not to "limit the pool of workers" but, rather, to "remove[] a barrier to entry by certain contractors who [sic] would

5

have been contractually unable to enter the PLA." Final Determination, 2/26/2018, at 12. The Secretary rejected Allan Myers' legal claims that PennDOT's imposition of the PLA requirement violates the prequalification provisions set forth in the State Highway Law and is arbitrary and capricious.

Allan Myers petitioned for this Court's review.[5]

## Appeal

On appeal, Allan Myers raises four issues for our consideration, which we combine into three for clarity. First, it argues that PennDOT's use of the PLA violates Pennsylvania's competitive bidding laws because the three different classes of bidders, *i.e.*, union contractors, nonunion contractors, and United Steelworkers contractors, will not be placed on an equal footing with respect to their ability to compete for the work. Second, Allan Myers argues that PennDOT abused its discretion by relying on the Keystone Report to justify its use of the PLA because that report is biased and flawed. Third, Allan Myers argues that the PLA violates the State Highway Law and the corresponding regulations because it deprives PennDOT of the ability to qualify bidders in accordance with the criteria mandated by law.

---

[5] This Court's review is governed by Section 1711.1(i) of the Commonwealth Procurement Code (Procurement Code), which states:

> (i) Standard of review.--The court shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency. The court shall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law.

62 Pa. C.S. §1711.1(i). *See also CenturyLink Public Communications, Inc. v. Department of Corrections*, 109 A.3d 820, 827 n.13 (Pa. Cmwlth. 2015).

## Competitive Bidding Requirements

In its first issue, Allan Myers argues that the PLA violates Pennsylvania's competitive bidding laws because it discriminates against nonunion contractors and favors United Steelworkers contractors. Specifically, Section 3-H of Article I of the PLA provides that a contractor bound by a collective bargaining agreement with United Steelworkers "will be permitted to utilize its [United Steelworkers] workforce and its [United Steelworkers collective bargaining agreement]," while all other contractors must hire their workforce through the Local Unions. R.R. 28a. United Steelworkers contractors are not bound by the no-strike provision in Article VI of the PLA, which applies only to the Local Unions.[6] Because PennDOT's bid solicitation does not prescribe common standards for all bidders on the Markley Street Project, it violates the "integrity of the competitive bidding process." Allan Myers Brief at 12 (citing *Ezy Parks v. Larson*, 454 A.2d 928, 932 (Pa. 1982)).

Allan Myers also argues that the PLA effectively precludes nonunion contractors from bidding on the Markley Street Project because it requires the winning bidder to hire all craft labor personnel through the Local Unions. However, Allan Myers cannot force its employees and subcontractors to join the Local Unions. What is more, the PLA does not require the Local Unions to accept Allan Myers' workforce or assign them back to Allan Myers if they are accepted. Allan Myers argues that it cannot prepare a meaningful bid "with an unknown workforce." Allan Myers Brief at 33.

---

[6] Article VI, Section 1 of the PLA states, in relevant part: "[t]he [Local] Unions agree that there will be no strikes or other work stoppages[.]" R.R. 32a.

PennDOT responds that this Court approved a PLA requirement in *Pickett*, 738 A.2d 20, *Sossong*, 945 A.2d 788, and *Hawbaker* (Pa. Cmwlth., No. 405 M.D. 2009, filed December 1, 2009). The State Highway Law authorizes PennDOT to develop specifications for its highway contracts, and PennDOT has the authority to use a PLA to ensure timely project performance.

## A. The Law on Competitive Bidding

We begin with a review of the law on competitive bidding. Section 512(a) of the Commonwealth Procurement Code (Procurement Code) requires all Commonwealth agency contracts to "be awarded by competitive sealed bidding except as otherwise provided in section 511 (relating to methods of source selection)." 62 Pa. C.S. §512(a). The competitive bidding process must result in the contract being awarded to "the lowest responsible bidder." 62 Pa. C.S. §512(g). A "responsible bidder" is one "that has submitted a responsive bid and that possesses the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." 62 Pa. C.S. §103.

Competitive bidding in public contracts is mandated by the Pennsylvania Constitution.[7] Competitive bidding requirements "guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of … contracts … and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders." *Yohe v. City of Lower Burrell*, 208 A.2d 847, 850 (Pa. 1965) (citation omitted). The intent of competitive bidding statutes is "to 'close, as far as possible, every avenue to favoritism and fraud in its varied

---

[7] Article III, Section 22 of the Pennsylvania Constitution requires that the General Assembly "shall maintain by law a system of competitive bidding under which all purchases of materials, printing, supplies or other personal property used by the government of this Commonwealth shall so far as practicable be made." PA. CONST. art. III, §22.

8

forms.'" *Premier Comp Solutions, LLC v. Department of General Services*, 949 A.2d 381, 382 n.1 (Pa. Cmwlth. 2008) (quoting *Louchheim v. Philadelphia*, 66 A. 1121, 1122 (Pa. 1907)).  Bidders for a public contract must be "on an equal footing" and enjoy the same opportunity for open and fair competition.  *Philadelphia Warehousing and Cold Storage v. Hallowell*, 490 A.2d 955, 957 (Pa. Cmwlth. 1985). Where there is no common standard on which bids are based, "[t]he integrity of the competitive bidding process is violated and the purpose of competitive bidding is frustrated."  *Ezy Parks*, 454 A.2d at 932.  Thus, when the actual "procedures followed emasculate the benefits of [competitive] bidding, judicial intervention is proper."  *Id*.  *See also Conduit and Foundation Corporation v. City of Philadelphia*, 401 A.2d 376, 379 (Pa. Cmwlth. 1979) ("[T]he courts will not condone a situation that reveals a clear potential to become a means of favoritism, regardless of the fact that the … officials may have acted in good faith in the particular case.").

Case law precedent has, on several occasions, addressed the use of a PLA in a public contract.  In certain circumstances a PLA has been held not to interfere with competitive bidding.

In *Pickett*, 738 A.2d 20, this Court considered whether a PLA requirement violated the competitive bidding requirements of the former Municipalities Authorities Act of 1945.[8]  In that case, a county authority required bidders on a convention center construction project to enter into a PLA, which mandated the employment of a certain number of union laborers at union wages. Nonunion contractors protested the bid, arguing that they were discouraged from bidding on the project because the PLA would necessitate drastic revisions in the

---

[8] Act of May 2, 1945, P.L. 382, *as amended*, *formerly* 53 P.S. §§301-322, repealed by Section 3 of the Act of June 19, 2001, P.L. 287.

structure of their working relationships with their employees, thereby effectively restricting the pool of eligible contractors and suppressing competition.

This Court held that the authority had the discretion to develop the contours of its public contract. We explained that the lowest responsible bidder does not necessarily mean "the one whose bid on its face is lowest in dollars;" rather, it includes a consideration of a bidder's financial responsibility, integrity, efficiency, industry experience, promptness and ability to successfully carry out the job. *Pickett*, 738 A.2d at 24. A key factor in *Pickett* was the need for prompt completion of the project. The authority faced the loss of an anchor tenant and state funding if construction was not completed by the specified date. Given those constraints, this Court held that the authority did not abuse its discretion by requiring the PLA.

Nevertheless, we recognized that the competitive bidding laws preclude public bodies from discriminating between union and nonunion contractors in the award of public projects. However, the protesters in *Pickett* failed to make a case of discrimination. We observed that

> [t]he PLA does not mandate the integration of local collective bargaining agreements, permits Plaintiffs [i.e., Appellants] to employ core [i.e. their existing non-union] personnel in ranges of 20% to 50% of the Project's workforce, does not contain provisions requiring discrimination based on union affiliation, and opens the bidding process to all non-union and union contractors. Quite simply, that it may be difficult or distasteful for Plaintiffs to accept the provisions of the PLA does not mean it is anti-competitive.

*Id*. at 25 (quotation to internal record omitted).

Nine years after *Pickett*, this Court was again confronted with a challenge to a PLA requirement. In *Sossong*, 945 A.2d 788, a contractor sought a preliminary injunction to prevent a school district from awarding a contract for two

school construction projects. The contractor alleged that the school district's inclusion of a PLA in the bidding process effectively prevented nonunion contractors from bidding, in violation of the lowest responsible bidder requirement set forth in Section 3911(a) of the Procurement Code.[9] The trial court denied the injunction request, and this Court affirmed. We noted that a trial court's decision on a preliminary injunction can be set aside only where "it is clear that no apparently reasonable grounds exist to support it." *Sossong*, 945 A.2d at 793 n.6. Given this deferential standard of review, we upheld the trial court's conclusion that the contractor did not establish "immediate and irreparable harm," a prerequisite for a preliminary injunction. *Id*. at 793.

We also concluded that the school district appropriately exercised its discretion to include the PLA requirement, noting that the bid stated that "time is of the essence" and that the work had to be performed with "no delays." *Id.* at 791. The PLA precluded strikes, lockouts, work stoppages or disruptions. As in *Pickett*, the PLA in *Sossong* was prompted by the need for prompt completion of the projects. Notably, *Sossong* did not address whether the terms of the PLA discriminated against nonunion contractors or favored union contractors, an issue presented in the case *sub judice*.

---

[9] It states:

> In the case of a contract to be entered into by a government agency through competitive sealed bidding, the contract shall be awarded to the lowest responsible and responsive bidder within 60 days of the bid opening, or all bids shall be rejected except as otherwise provided in this section.

62 Pa. C.S. §3911(a). Section 3102 defines a "government agency" as "[a]ny Commonwealth agency, any transportation authority or agency created by statute or any political subdivision or municipal or other local authority, or agency of any political subdivision or local authority." 62 Pa. C.S. §3102.

This Court again considered a PLA requirement in *Hawbaker*, (Pa. Cmwlth., No. 405 M.D. 2009, filed December 1, 2009) (single judge opinion)(Pellegrini, J.).[10] In that case, nonunion contractors requested that this Court preliminarily enjoin the Department of General Services from awarding the successful bidder the design/build contract on a construction project at the State Correctional Institution (SCI) at Graterford, and enjoin the use of a PLA in all of the Department of General Services' future projects. The nonunion contractors asserted, *inter alia*, that the terms of the PLA unlawfully discriminated against them by placing them at a competitive disadvantage. At the preliminary injunction hearing, the nonunion contractors and a nonunion employee testified about the adverse effects of the PLA. The Department presented testimony on the urgency of completing construction at SCI-Graterford due to the growing prison population.

In denying the preliminary injunction, this Court first observed that it is illegal "to distinguish between contractors employing union people from those employing people who were not organized." *Hawbaker*, slip op. at 14 (quotation omitted). Nevertheless, we found that the PLA, as was the case in *Pickett* and *Sossong*, allowed nonunion contractors to bid on the project and did not require them to employ persons based on union affiliation. Thus, this Court declined to "say that all PLAs or this one are illegal." *Hawbaker*, slip op. at 17.[11]

---

[10] An unpublished single judge opinion, while not binding, may be cited for its persuasive value. *See* Section 414(b) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(b) ("Except as provided in subsection (d) (relating to single judge opinions in election law matters), a single-judge opinion of this court, even if reported, shall be cited only for its persuasive value and not as a binding precedent.").

[11] In *Hawbaker*, the Court noted that, in requesting an injunction, a petitioner must prove that (1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the injunction

**B. Analysis**

With these principles in mind, we turn to the question of whether the instant PLA violates competitive bidding. Article I of the PLA requires all contractors to hire their workforce through the Local Unions, but United Steelworkers contractors are exempted from that requirement. Article VI of the PLA provides that all Local Unions "agree that there will be no strikes or other work stoppages." R.R. 32a. There is no evidence that United Steelworkers are bound by this provision. According to Allan Myers, this aspect of the PLA allows United Steelworkers contractors to "bid in a completely different environment." Allan Myers Brief at 15.

PennDOT responds that it exempted United Steelworkers contractors from hiring hall obligations and union security provisions after multiple contractors challenged its August 2017 bid solicitation. This exemption was intended to "avoid conflicts and overlapping;" otherwise, a successful bidder might have to comply with "two different union [] requirements." PennDOT Brief at 45. In any event, all bidders, regardless of their affiliation with United Steelworkers, must adhere to the terms and conditions of the PLA.

---

than from granting it; (3) the injunction will restore the parties to their status quo as it existed immediately before the alleged wrongful conduct; (4) the injunction is reasonably suited to abate the alleged wrong; (5) the petitioner's right to relief is clear; and (6) the public interest will not be harmed if the injunction is granted. A petitioner must meet all six prongs of this test to be awarded an injunction. *Hawbaker*, slip op. at 8-9 (citing *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc*., 828 A.2d 995 (Pa. 2003)).

In denying the request for a preliminary injunction, the Court further ruled that the nonunion contractors failed to prove that greater injury would result from refusing an injunction. Relying on the department personnel's testimony regarding the crowded conditions at SCI-Graterford and the growing safety and security concerns for both correctional officers and inmates, this Court concluded that the "public would be harmed by granting the request for injunctive relief." *Hawbaker*, slip op. at 30.

We agree with Allan Myers that the exemption for United Steelworkers contractors tilts the playing field. If affiliated with United Steelworkers, a successful contractor can use its existing workforce. Other contractors, however, must hire their workforce through the Local Unions. In addition, the United Steelworkers collective bargaining agreement is not among the agreements appended to the PLA. Thus, it is not established that the steelworkers are bound by a no-strike provision. Stated otherwise, United Steelworkers contractors do not bid "on an equal footing" with other contractors. *Hallowell*, 490 A.2d at 957. In addition, by requiring the winning bidder to hire all craft labor personnel through the Local Unions, the PLA introduced "uncertainty in bidding the job" for prequalified nonunion contractors like Allan Myers. Allan Myers Brief at 33.

Nevertheless, PennDOT counters that in *Pickett*, *Sossong*, and *Hawbaker,* this Court established that PLAs "are legally valid in principle" where used to reduce potential delays and inefficiencies. PennDOT Brief at 14. Indeed, the PLA states that "[t]ime is of the essence" for the Markley Street Project and that labor shortages may cause "increased costs" and "unwarranted traffic congestion." R.R. 25a-26a. Section 403 of the State Highway Law[12] authorizes PennDOT to "prepare and approve specifications" for highway construction contracts, which includes, according to PennDOT, discretion to manage project labor. PennDOT Brief at 18. Absent compelling evidence that it acted in "bad faith, or capriciously,

---

[12] Section 403 of the State Highway Law provides:

> All work of construction, building or rebuilding of highways, excepting that of repairing and maintenance, done under the provisions of this act, may be either (1) by the agents, including cities when so designated by the department, servants and employes of the department, *or (2) by contract, and shall be according to plans and specifications to be prepared or approved in every case by the department*.

36 P.S. §670-403 (emphasis added).

14

or abused its power," PennDOT argues that its decision to use a PLA must be upheld. We are not persuaded.

We agree that PennDOT has the discretion under the State Highway Law to develop specifications for highway contracts. However, it is equally well established that a public agency cannot exercise its discretion contrary to the competitive bidding laws, which prohibit discrimination between union and nonunion contractors in the award of public contracts. *Pickett*, 738 A.2d at 25. To be sure, the PLA states that "any qualified contractors may bid or perform work on this Project, regardless of whether or not they are affiliated with the [Building and Construction] Council or its Local Unions." R.R. 26a. Notwithstanding this lip service to the principle of competitive bidding, the PLA does not place nonunion contractors "on an equal footing" with union contractors. *Hallowell*, 490 A.2d at 957. Unlike contractors affiliated with the Local Unions or United Steelworkers, a nonunion contractor that bids on the Markley Street Project cannot use its own experienced workforce. Rather, under Article I of the PLA, the nonunion contractor must hire all craft labor personnel employed on the Project through the Local Unions "in accordance with the hiring procedures of Local Agreements, included as Appendix B hereto." R.R. 28a.

PennDOT points out that not all Local Agreements require "hiring through hiring halls or referral procedures." PennDOT Brief at 39. For example, the collective bargaining agreement with the Laborers District Council, one of the Local Unions, provides that an employer reserves the right to use its key employees, and the union will furnish competent laborers at the employer's request. However, under Section 3-E of Article I of the PLA, a successful bidder is "bound by the terms of the Local Union Collective Bargaining Agreements … *and any successor*

15

*agreements or amendments thereto*." R.R. 27a (emphasis added). It is unknown whether a "successor agreement" would amend this hiring requirement.

Allan Myers cannot make its employees or subcontractors join a union. *See Labor Relations Board v. Fabrication Specialists, Inc.*, 383 A.2d 802 (Pa. 1978) (recognizing that an employee has a right to join, or decline to join, a union or other existing labor organizations). The PLA does not guarantee that the Local Unions will accept Allan Myers' existing workforce as members or assign them back if they are accepted. Allan Myers cannot bid for the Project with an unknown workforce. The PLA has effectively precluded a nonunion contractor, such as Allan Myers, from participating in the bid solicitation.

*Pickett*, *Sossong* and *Hawbaker* are all factually distinguishable. In *Pickett*, the convention center had to be completed by an inflexible date because of demands of the state funding and the need to keep an anchor tenant. In *Sossong*, two school buildings had to be completed in time for the school opening in the fall. In *Hawbaker*, timely completion of a prison was critical because of a growing inmate population and safety concerns. Here, by contrast, there is no evidence that the Markley Street Project has a critical deadline, notwithstanding the PLA's statement that "[t]ime is of the essence for the Project." R.R. 25a. In *Pickett,* the PLA did not mandate the integration of local collective bargaining agreements and permitted nonunion contractors to employ their core personnel in ranges of 20% to 50% of the whole workforce. Here, the PLA integrates the local collective bargaining agreements "and any successor agreements or amendments" and requires that nonunion contractors hire all craft labor personnel through the Local Unions. R.R. 27a. The PLAs in *Pickett*, *Sossong* and *Hawbaker* did not contain an exemption for certain contractors with a specific union affiliation. Here, by contrast, the PLA

16

permits United Steelworkers contractors to use their normal workforce but requires nonunion contractors to hire through the Local Unions. In sum, *Pickett*, *Sossong*, and *Hawbaker* are factually distinguishable.

Further, our precedent in *Pickett* and *Sossong* did not establish the broad principle that a PLA is appropriate so long as it contains the boilerplate language "time is of the essence" and "nonunion contractors may bid." The use of a PLA is permitted where the contracting agency can establish extraordinary circumstances, and PennDOT did not make that demonstration in this case. The Markley Street Project is a long term road improvement, the first phase of which was completed a year ahead of schedule. Nor is there any evidence that there is a labor shortage in the greater Philadelphia area. The Keystone Report's recommendation did not justify the PLA because it did not identify any extraordinary circumstance surrounding the Markley Street Project that warranted its use. All road improvements inconvenience motor vehicle operators. The PLA favored contractors under agreement with United Steelworkers, and for this reason alone, there is no common standard on which bids are based. This violates "[t]he integrity of the competitive bidding process" and frustrates the "purpose of competitive bidding." *Ezy Parks*, 454 A.2d at 932.

We hold, therefore, that the PLA requirement in the bid solicitation for the Markley Street Project violates competitive bidding. Given this conclusion, we need not consider whether PennDOT acted in good faith in revising the PLA after it withdrew the August 2017 bid solicitation. This is because courts will not authorize a bid with "a clear potential to become a means of favoritism, *regardless of the fact that the … officials may have acted in good faith in the particular case*." *Conduit and Foundation Corporation*, 401 A.2d at 379 (emphasis added). PennDOT's good

17

faith, or lack thereof, is irrelevant because the PLA places United Steelworkers contractors in a favored position.

## Conclusion

For all of the foregoing reasons, we hold that the Secretary of Transportation erred in holding that the use of the PLA in the Markley Street Project bid does not violate Pennsylvania's competitive solicitation bidding laws.[13] Accordingly, we reverse the Secretary's order of February 26, 2018, and we cancel PennDOT's solicitation.[14]

_____
MARY HANNAH LEAVITT, President Judge

Judge Fizzano Cannon did not participate in the decision in this case.

---

[13] In light of our disposition, we do not address Allan Myers' remaining issues.

[14] Section 1711.1(j) of the Procurement Code states:

> (j) Remedy. -- if the determination is not affirmed, the court may enter any order authorized by 42 Pa. C.S. §706 (relating to disposition of appeals), provided that, if the court determines that the solicitation or award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract.

62 Pa. C.S. §1711.1(j).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allan Myers, L.P.,             :
          Petitioner       :
                          :
          v.             :   No. 314 C.D. 2018
                          :
Department of Transportation,  :
          Respondent   :

## **O R D E R**

AND NOW, this 11th day of January, 2019, the order of the Secretary of Transportation, dated February 26, 2018, in the above-captioned matter, is hereby REVERSED, and the Department of Transportation's bid solicitation of December 20, 2017, is CANCELLED.

_____
MARY HANNAH LEAVITT, President Judge