Reading Blue Mountain and Northern : 
Railroad, : 
                        Appellant : 
                                  : 
                    v. : 
                                    : 
Seda-Cog Joint Rail Authority and : 
Board of Seda-Cog Joint Rail Authority, :   No. 1627 C.D. 2018
Susquehanna Union Railroad Company, :   No. 1628 C.D. 2018
and Carload Express, Inc. :   Argued: June 8, 2020

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ANNE E. COVEY, Judge

OPINION BY
JUDGE COVEY                         FILED: July 6, 2020

        Reading Blue Mountain and Northern Railroad (Reading) appeals from the Northumberland County Common Pleas Court's (trial court) October 17, 2018 orders granting Carload Express, Inc.'s (Carload) Motion for Summary Judgment (Carload Motion) and Seda-Cog Joint Rail Authority's and the Board of Seda-Cog Joint Rail Authority's (Board) (collectively, Authority) Motion for Summary Judgment (Authority Motion). The five issues before this Court are whether the trial court erred: (1) by granting the Authority's demurrer to Reading's claim that the Authority improperly competes with private enterprise in violation of Section 5607(b)(2) of the Municipality Authorities Act (MAA);[1] (2) by ruling that the competitive bidding requirement in Section 5614(a)(1) of the MAA[2] is inapplicable, and granting an effective demurrer to that portion of Reading's claims; (3) by granting Carload's Motion and the Authority's Motion (collectively, Motions) on the

_____

[1] 53 Pa.C.S. § 5607(b)(2).
[2] 53 Pa.C.S. § 5614(a)(1).

basis of extraneous factors that are irrelevant as a matter of law; (4) by granting the Motions on the basis of Reading's Phase 1 financial submission; and (5) by finding that Reading did not adduce sufficient evidence that the Request for Proposals – Operation of Five Short Line Railroads in Central Pennsylvania (RFP) process was improper, unjust or failed to comply with basic fairness standards. After review, we affirm the trial court's orders.

**Background**

Reading is a privately held railroad company, established in 1990. A substantial portion of Reading's business is providing freight rail service to approximately 50 industries located in 9 east central Pennsylvania counties, including Northumberland County. The Authority was formed in 1983 by 5 counties, including Northumberland County, for the purpose of acquiring, owning and maintaining various railroad properties throughout central Pennsylvania, with a primary mission of providing rail freight service and fostering economic development and job creation by improving and expanding rail infrastructure in the region. The Authority owns approximately 200 miles of rail lines in 10 counties, including Northumberland County, on which it provides freight rail service through a contracted, private common carrier rail operator. The Authority is governed by a 16-member Board, with 2 members appointed from each of its member counties (Centre, Clinton, Columbia, Lycoming, Mifflin, Montour, Northumberland and Union).

Since January 2007, Susquehanna Union Railroad Company (Susquehanna) has been the Authority's rail freight operator, pursuant to an operating agreement which expired on June 30, 2017. In September 2013, after learning that the Authority intended to seek bids to operate its rail lines upon the expiration of its operating agreement with Susquehanna, Reading notified the Authority's Chairman Jerry Walls (Walls) that Reading was interested in bidding. Thereafter, the Authority

convened an Operating Agreement Committee (OAC) to develop a bid process and a new operating agreement (Proposed Operating Agreement).[3]

On May 16, 2014, the Authority issued the RFP, wherein it "invite[d] proposals from experienced railroad operators capable of providing the specialized, professional services required for the operation of the [Authority's] rail lines." Reproduced Record (R.R.) at 27a. The RFP consisted of a two-phase review. In RFP Phase 1, potential proposers were asked to respond to a Request for Qualifications (RFQ) by August 1, 2014, regarding their approach to operations, qualifications and experience, financial capability, and potential conflicts. *See* R.R. at 37a-38a. The RFP reflected that, based upon their responses, each RFP Phase 1 proposer would receive a raw score of up to 60 points, and the 3 highest scorers (or more, in the case of a tie) would be invited to proceed to RFP Phase 2. *See* R.R. at 37a-39a.

Reading, Carload and Susquehanna were among the 5 proposers that submitted responses as part of RFP Phase 1.[4] Carload had the highest RFP Phase 1 score. Because Reading had the lowest score, the Authority did not invite Reading to move to RFP Phase 2. On September 10, 2014, with 6 Board members abstaining,[5] the Authority's Board voted 7 to 3 to award the new operating agreement to Carload. Because Section 5610(e) of the MAA mandates that, unless the bylaws otherwise specify, the Authority may take action only upon the vote of a majority of the

---

[3] By January 2011 letter, the Commonwealth of Pennsylvania, Office of Attorney General (AG), notified the Authority that the process it had been using to select rail operators may not have been MAA-compliant. *See* Reproduced Record (R.R.) at 21a-22a. However, by April 26, 2011 letter, the AG stated: "After careful consideration, we have decided to take no action at this time regarding the freight railroad operation contract. Nothing should be inferred or implied by this decision." R.R. at 1908a. Accordingly, Reading's reliance on the AG letter in support of its arguments herein is misplaced.

[4] The additional proposers were Genesee & Wyoming and Northern/Stonepeak. *See* R.R. at 1226a.

[5] The 6 Board members recused themselves to avoid the appearance of impropriety after Reading objected based on conflicts of interest due to their relationships with Susquehanna. *See* R.R. at 1226a, 1277a-1280a.

members present at a meeting, 53 Pa.C.S. § 5610(e), the Authority took the position that the vote was insufficient to contract with Carload. To date, no operating agreement has been awarded.[6]

On October 28, 2015, Reading filed a complaint in the trial court against the Authority seeking declaratory and injunctive relief (Complaint). *See* R.R. at 1a-44a, 592a. Therein, Reading named Carload, Susquehanna and Northern Plains Railroad, Inc. (Northern) as indispensable parties.[7] *See* R.R. at 4a. In Count I of the Complaint, Reading requested a declaration from the trial court that the Authority violated Section 5607(b)(2) of the MAA by prohibiting direct competition with private enterprise. *See* R.R. at 12a-14a. In Count II, Reading asked for a declaration that the Authority violated competitive bidding requirements of Section 5614 of the MAA and Section 3911(a) of the Commonwealth Procurement Code (Procurement Code).[8] *See* R.R. at 14a-16a. In Count III, Reading sought an injunction prohibiting

---

[6] Carload protested the Authority's refusal to award it the new operating agreement. On July 23, 2015, the Authority filed a civil action in the Clinton County Common Pleas Court seeking a declaration that the 7 to 3 vote was insufficient to award the new operating agreement to Carload (Clinton County Case). Carload counterclaimed that the vote was effective. Susquehanna also counterclaimed, concurring that the Authority's vote was ineffective, and asserting that RFP Phase 2 should be repeated because one of the Authority's voting member's ethics violation tainted the process. The Clinton County Common Pleas Court granted summary judgment in the Authority's favor. Carload appealed to this Court. On May 3, 2018, this Court held that the Authority's vote was effective. *See* R.R. at 592a-594a; *see also Seda-Cog Joint Rail Auth. v. Carload Express, Inc.*, 185 A.3d 1232 (Pa. Cmwlth. 2018). The Authority appealed to the Pennsylvania Supreme Court, which granted limited allocatur. *See* R.R. at 603a-605a; *see also Seda-Cog Joint Rail Auth. v. Carload Express, Inc.*, 201 A.3d 143 (Pa. 2019). That appeal is pending.

[7] Reading did not assert any claims against Carload, Susquehanna or Northern.

[8] Section 3911(a) of the Procurement Code specifies:

> In the case of a contract to be entered into by a government agency through competitive sealed bidding, the contract shall be awarded to the lowest responsible and responsive bidder within 60 days of the bid opening, or all bids shall be rejected except as otherwise provided in this section.

62 Pa.C.S. § 3911(a).

the Authority from continuing with the RFP process until the merits of the case were decided. *See* R.R. at 16a-18a.

On December 7, 2015, the Authority and Susquehanna filed preliminary objections to the Complaint, claiming: Reading lacked standing to file the Complaint; the competition claims were preempted by Section 10501 of the Interstate Commerce Commission Termination Act (ICCTA);[9] Reading misinterpreted Section 5607 of the MAA; Section 5614 of the MAA does not require competition to award operating agreements; and the Procurement Code's public works contract provisions do not apply to this RFP. *See* R.R. at 45a-99a, 366a-428a. On December 28, 2015, Carload filed preliminary objections to the Complaint, asserting that Reading lacked standing to file the Complaint. *See* R.R. at 100a-111a, 252a-365a. On December 22, 2015, Reading discontinued the action as to Northern after Northern withdrew from the RFP process. *See* Authority Br. at 9 n.3; *see also* R.R. at 249a. Reading filed answers to the preliminary objections. *See* R.R. at 112a-248a.

On August 12, 2016, the trial court overruled the Authority's, Carload's and Susquehanna's objections to Reading's standing, overruled the Authority's demurrer to Count II of the Complaint, held that the Authority's federal preemption objection was moot, and sustained the Authority's objections to Count I on the basis that the trial court had no legal basis to prohibit the Authority from leasing its rail lines, receiving state grants or enhancing its rail assets. Accordingly, the trial court dismissed Count I. *See* R.R. at 521a-527a. Despite that the trial court overruled the demurrer to Count II, it declared that "the reliance by [Reading] on [Section 5614(a)(1) of the MAA] is misplaced[,] as this is not a situation where the Authority is seeking to procure something at a cost to it from the 'lowest responsible bidder'; thus, it is inapplicable and not subject to further analysis." R.R. at 524a n.1.

---

[9] 49 U.S.C. § 10501.

5

Consequently, the trial court permitted Reading to proceed with its Count II claim that the Authority's RFP Phase 1 process was unfair and designed to eliminate Reading. The trial court ordered the parties to file answers to Counts II and III of the Complaint. On September 1, 2016, the Authority, Carload and Susquehanna filed their answers with new matter.[10] *See* R.R. at 528a-582a. On September 23, 2016, Reading filed replies to the new matter. *See* R.R. at 569a-582a. The parties undertook discovery.

On March 14, 2018, Reading filed a petition requesting a preliminary injunction, similar to one sought in a companion case the Authority filed in the Clinton County Common Pleas Court (Clinton County Case), prohibiting the Authority from changing the status quo, i.e., requiring the Authority to keep Susquehanna as the Authority's current rail operator until the merits of the case were decided.[11] *See* R.R. at 588a-677a. The trial court granted the preliminary injunction on March 19, 2018. *See* R.R. at 678a. However, the Authority and Carload opposed the preliminary injunction on March 29, 2018 and April 16, 2018, respectively. *See* R.R. at 679a-849a. On April 17, 2018, the trial court vacated its March 19, 2018 order and scheduled a hearing. *See* R.R. at 850a-851a. On May 1, 2018, Reading withdrew its preliminary injunction petition. *See* R.R. at 852a. Accordingly, only Reading's claim regarding the unfairness of Phase 1 of the Authority's RFP remained pending before the trial court.

On August 1, 2018, at the close of discovery, the Authority and Carload filed the Motions. *See* R.R. at 855a-1439a, 1778a-1823a. The Authority argued in its Motion that Reading disqualified itself from being invited to participate in RFP Phase 2 because: Reading failed to provide the required financial information; Reading

---

[10] Carload and Susquehanna did not assert any counterclaims or cross-claims therein.

[11] Relative to the Clinton County Case, after the Authority sought a similar injunction, the parties entered into a tolling agreement extending the operating agreement with Susquehanna until after the appeal was resolved. *See* R.R. at 593a-594a, 603a-605a.

6

produced no evidence that the RFP process was unfair or designed to eliminate Reading from consideration; and Reading had significant Category 4 conflicts, in that Reading's President Wayne Michel (Michel) testified that Reading's true goal was not to work with the Authority, but to privatize the Authority's infrastructure. *See* R.R. at 1229a-1237a, 1324a-1325a. Carload asserted in its Motion that Reading's RFP Phase 1 proposal was incomplete without Reading's financial documentation, making it nonresponsive and void as a matter of law; the Authority could not waive Reading's deficiencies; or, in the alternative, Reading could not prove that its failure to advance to RFP Phase 2 was due to the Authority's unfair or intentional effort to exclude it, rather than Reading's refusal to submit its financial information. *See* R.R. at 862a-887a. Reading opposed the Motions on September 7, 2018. *See* R.R. at 1440a-1651a, 1824a-1873a. On September 18, 2018, Susquehanna filed a brief in support of the Motions. *See* R.R. at 1652a-1777a.

The trial court conducted argument on the Motions on October 3, 2018. On October 17, 2018, the trial court granted the Motions, ruling:

(1) By not submitting the Financial Capability documents[,] as required by the [RFP], [Reading] disqualified itself (this resulted in it being the lowest score when all other entities complied);

(2) [Reading] has produced no evidence that the process was unfair or designed to eliminate it from consideration;

(3) [Reading] was not attempting to be a cooperative bid award winner[,] as its goal was to privatize the subject railroad lines of operation.

R.R. at 1874a, 1876a. Reading appealed from the trial court's October 17, 2018 orders to this Court.[12] On January 18, 2019, the trial court filed a Statement of

_____

[12] Reading's appeal from the trial court's order granting the Authority's Motion was docketed at No. 1627 C.D. 2018. Reading's appeal from the trial court's order granting Carload's Motion was docketed at No. 1628 C.D. 2018. Reading also appealed from the trial court's August

Reasons in Lieu of Formal Opinion (Statement). *See* R.R. at 1885a-1888a. On October 15, 2019, the Authority and Carload filed their briefs with this Court.[13]

## Discussion

### 1. Trial Court's August 12, 2016 Order (Preliminary Objections)

The law is well settled:

'Where a [trial court] dismisses [counts of] a complaint based on preliminary objections, this Court's review is limited to determining whether the trial court committed an error of law or an abuse of discretion.'[14] When considering preliminary objections, we must accept as true all well-pleaded material facts alleged in the complaint and all reasonable inferences deducible therefrom. A preliminary objection should be sustained only in cases

---

12, 2016 order (*see* Pa. Cmwlth. No. 1626 C.D. 2018). The matters were consolidated on January 31, 2019, but the Court ordered Reading to show cause why the appeals should not be quashed as interlocutory. On February 11, 2019, Reading responded that, since the trial court's August 12, 2016 order dismissed Count I of Reading's Complaint, and the trial court's October 17, 2018 orders resolved Reading's remaining declaratory relief claims and put it out of court, Reading's challenges to the trial court's August 12, 2016 order and October 17, 2018 orders were ripe for appeal. On April 22, 2019, this Court quashed the appeal from the trial court's August 12, 2016 order as interlocutory, but ordered the instant appeals from the trial court's October 17, 2018 orders to proceed. Notices of appeal from final orders that dispose of all claims and all parties in a case, are "viewed as drawing into question any prior non-final orders that produced the judgment." *K.H. v. J.R.*, 826 A.2d 863, 871 (Pa. 2003). Accordingly, this Court's review is of the trial court's August 12, 2016 and October 17, 2018 orders.

[13] On October 31, 2019, this Court granted Reading an extension of time until December 2, 2019 to file a reply brief, which Reading filed on December 9, 2019. On December 16, 2019, the Authority filed an Application in the Nature of a Motion to Strike Reading's Untimely Reply Brief, in which Carload joined (Application to Strike). On January 14, 2020, this Court ordered that the Application to Strike be submitted for disposition with the merits of this appeal. Because Reading's reply brief was not timely filed, the Authority's Application to Strike is granted. Notwithstanding, Reading raised the issues contained therein at oral argument which did not persuade the Court.

[14] "'An abuse of discretion is not merely an error in judgment;' rather, '[a]n abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied or judgment exercised is manifestly unreasonable or is the result of partiality, prejudice, bias, or ill will.'" *CenturyLink Pub. Commc'ns, Inc. v. Dep't of Corr.*, 109 A.3d 820, 827 n.13 (Pa. Cmwlth. 2015) (quoting *Henderson v. Unemployment Comp. Bd. of Review*, 77 A.3d 699, 713 (Pa. Cmwlth. 2013)).

> when, based on the facts pleaded, it is clear and free from doubt that the facts pleaded are legally insufficient to establish a right to relief. Because a preliminary objection in the nature of a demurrer presents a question of law, this Court's standard of review of a court of common pleas' decision to sustain a demurrer is *de novo* and the scope of review is plenary. Similarly, whether immunity applies is a question of law subject to our *de novo* review.

*Minor v. Kraynak*, 155 A.3d 114, 121 (Pa. Cmwlth. 2017) (citations omitted; italics added) (quoting *Kittrell v. Watson*, 88 A.3d 1091, 1095 (Pa. Cmwlth. 2014)).

### a. Section 5607(b)(2) of the MAA

Reading first argues that the trial court erred by granting the Authority's demurrer to Reading's claim that the Authority improperly competes with private enterprise in violation of Section 5607(b)(2) of the MAA. Reading Br. at 21-37. The Authority responded that Section 5607(b)(2) of the MAA is inapplicable here because the Authority preexisted Reading by several years, Reading does not serve substantially the same purpose, and Section 5607(b)(2) of the MAA does not prohibit the Authority from leasing its property. *See* Authority Br. at 22-34. Carload agreed that the Authority did not violate the MAA's anticompetition clause because Section 5607(b)(2) of the MAA is a present tense limitation and does not apply to the Authority's property leases. *See* Carload Br. at 40-46.

"Municipal authorities are not creatures, agents or representatives of the municipalities that organize them[,] but are independent agencies of the [C]ommonwealth[,]" *O'Hare v. Cty. of Northampton*, 782 A.2d 7, 13 (Pa. Cmwlth. 2001), "invested with certain subordinate governmental functions for reasons of convenience and public policy." *London Grove Twp. v. Se. Chester Cty. Refuse Auth.*, 517 A.2d 1002, 1004 (Pa. Cmwlth. 1986). "They are created, governed, and the extent of their powers determined, by the legislature." *Id.* Accordingly, "[t]he power and authority of a municipal authority is limited to that granted it by its

9

enabling legislation." *Beaver Falls Mun. Auth. v. Mun. Auth. of the Borough of Conway*, 689 A.2d 379, 383 (Pa. Cmwlth. 1997).

> Section 5607(d) of the MAA provides, in relevant part:

> **Every authority may** exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:

> . . . .

> (4) To acquire, purchase, hold, lease as lessee and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the authority, and to sell, **lease as lessor**, transfer and dispose of **any property or interest therein at any time acquired by it**.

> (5) To acquire by purchase, lease or otherwise and to construct, improve, maintain, repair and operate projects.

> . . . .

> (14) Without limitation of the foregoing, . . . to enter into contracts, leases or other transactions with any . . . corporation . . . .

53 Pa.C.S. § 5607(d) (emphasis added). However, the exercise of those above-enumerated powers is limited by Section 5607(b)(2) of the MAA, which states, in pertinent part:

> The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, **none of the powers granted** by this chapter **shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects** . . . **which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes**.

53 Pa.C.S. § 5607(b)(2) (emphasis added).

> By prohibiting direct competition between private entities and municipal authorities, the [Section 5607(b)(2) of the MAA] limiting provision balances the important public role of municipal authorities with 'the unfair competitive advantage that would be enjoyed by municipal authorities, in light of their exemption from property taxation and ability to raise capital via the issuance of tax-free bonds, and freedom from the substantial expense associated with regulation.'

*Capital City Cab Serv., Inc. v. Susquehanna Area Reg'l Airport Auth.*, 470 F. Supp. 2d 462, 470 (M.D. Pa. 2006) (quoting *Chester Water Auth. v. Pa. Pub. Util. Comm'n*, 868 A.2d 384, 389-90 (Pa. 2005) (citation omitted)).

In the Complaint, Reading specifically asserted that the Authority operates in violation of Section 5607(b)(2) of the MAA's anticompetition provision by competing directly with and to the exclusion of privately owned rail freight operators, like Reading, and seeking state funding to expand, increase and enhance its rail assets to compete with those private operators. *See* R.R. at 13a-14a. Reading relied upon *Dominion Products & Services, Inc. v. Pittsburgh Water & Sewer Authority*, 44 A.3d 697 (Pa. Cmwlth. 2011), to support its position. *See* R.R. at 13a.

> The issue before us requires us to engage in statutory interpretation. An issue of statutory interpretation presents a question of law for which our standard of review is *de novo* and our scope of review is plenary. We are guided in our analysis by the Statutory Construction Act [of 1972 (SCA)], 1 Pa.C.S. §§ 1501-1991, which provides that the object of all statutory interpretation is to ascertain and effectuate the intent of the General Assembly. *Id.* § 1921(a). Generally, a statute's plain language provides the best indication of legislative intent. When the statutory language is ambiguous, however, we look to the various factors listed in [Section 1921(c) of the SCA,] 1 Pa.C.S. § 1921(c) to ascertain its meaning.

11

*Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 245 (Pa. 2019) (citations omitted).

The term "existing" is not defined in the MAA. Where a statutory term is not defined, this Court will look to its common and approved usage. *Municipality of Mt. Lebanon v. Fillen*, 151 A.3d 722 (Pa. Cmwlth. 2016). "[T]o ascertain the common usage and meaning of a word in a statute, the courts may properly consider dictionary definitions." *Cox v. Johnstown Hous. Auth.*, 212 A.3d 572, 580 (Pa. Cmwlth. 2019); *Municipality of Mt. Lebanon*. According to Merriam-Webster's Collegiate Dictionary (11th ed. 2004) (Merriam-Webster), to "exist" means "to have real being . . . : to have being in a specified place or with respect to understood limitations or conditions . . . ." *Id*. at 438. "Existent" is defined as "having being : EXISTING . . . : existing now : PRESENT . . . ." *Id*. "Being" is defined as "the quality or state of having existence . . . : something that actually exists . . . ." *Id*. at 110.

In *Evansburg Water Co. v. Perkiomen Township*, 569 A.2d 428 (Pa. Cmwlth. 1990), this Court concluded that an authority did not violate Section 4A(b)(2) of the former Municipality Authorities Act of 1945,[15] the predecessor to Section 5607(b)(2) of the MAA, by creating a new public water system for a proposed residential development that was not "presently serve[d]" by a private

---

[15] Act of May 2, 1945, P.L. 382, *as amended*, *formerly* 53 P.S. § 306A(b)(2), repealed by the Act of June 19, 2001, P.L. 287, which stated:

> The purpose and intent of this act being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity, and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the powers granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

*Evansburg Water Co.*, 569 A.2d at 429.

company that supplied water to an existing residential development in the same municipality. *Evansburg Water Co.*, 569 A.2d at 430. In *Dominion Products*, this Court upheld a trial court's ruling that a water and sewer authority (using a third-party contractor) violated Section 5607(b)(2) of the MAA by creating and implementing a warranty protection and water and sewer line repair program for its customers when more than 20 existing local businesses already provided those services. The Court reasoned that a municipal authority may only fill voids not presently served by existing enterprises.

Based upon the plain words of Section 5607(b)(2) of the MAA and the *Evansburg Water Co.* and *Dominion Products* holdings,[16] this Court concludes that a municipal authority violates Section 5607(b)(2) of the MAA when it duplicates or competes with an enterprise that *already* exists when the authority undertakes to provide substantially the same service as the private enterprise in the same geographic area. *See Northampton, Bucks Cty., Mun. Auth. v. Bucks Cty. Water & Sewer Auth.*, 508 A.2d 605, 615 (Pa. Cmwlth. 1986) ("This clause of the statute is phrased in the present tense[.]").[17]

Moreover, Section 5607(b)(2) of the MAA only prohibits an authority from duplicating or competing with an existing enterprise "in the construction, financing, improvement, maintenance, extension or operation of any project[18] or projects . . . ." 53 Pa.C.S. § 5607(b)(2). Section 5607(d)(4) of the MAA expressly

---

[16] This Court acknowledges, as the Authority declares, that *per curiam* orders are limited to stating the law of the case and lack precedential effect. *Commonwealth v. Thompson*, 985 A.2d 928 (Pa. 2009). However, contrary to the Authority's claim, *see* Authority Br. at 26 n.11, *Dominion Products* is not a *per curiam* order. Rather, it is an opinion in which the authoring judge is identified. Accordingly, *Dominion Products* may be cited as precedent.

[17] *Northampton, Bucks County, Municipal Authority* was decided pursuant to Section 4A(b)(2) of the former Municipality Authorities Act of 1945.

[18] Section 5602 of the MAA defines "project" to include "any structure, facility or undertaking which an authority is authorized to acquire, construct, finance, improve, maintain or operate[.]" 53 Pa.C.S. § 5602.

13

authorizes an authority to acquire and lease property. *See* 53 Pa.C.S. § 5607(d)(4). Therefore, leasing property is not among authority activities constrained by Section 5607(b)(2) of the MAA.[19] *See In re Senor Appeal*, 233 A.2d 237, 239 (Pa. 1967) (the deliberate omission from the MAA "of the power to acquire and hold property shows a clear legislative design that the proviso was not to be a restriction on the authority's right[s.]"); *see also Dauphin Cty. Gen. Auth. v. Dauphin Cty. Bd. of Assessments*, 768 A.2d 895 (Pa. Cmwlth. 2000) (the acquisition, holding and leasing of property does not violate the MAA's noncompete clause).[20]

"The issue thus presented is whether the services provided for by the [Authority] do in fact duplicate or compete with the enterprises of [Reading or another freight rail service operator]. If the services provided by the [Authority's] [operating agreement] are distinct, there is no violation of the [MAA] . . . ." *Para Transit Corp. v. Monroe Cty.*, 468 A.2d 548, 550 (Pa. Cmwlth. 1983).[21] Such is the case here.

In the instant matter, the RFP reflects that the Authority was formed in 1983 under the MAA in response to shipper concerns over Consolidated Rail Corporation's (Conrail) threatened abandonment of 80 miles of rail lines that "would have left a significant void in rail service for industry throughout central Pennsylvania." R.R. at 28a. Shipper groups met and determined that, in order to

---

[19]     We must presume that, if the legislature had intended for Section [5607(b)(2) of the MAA] to encompass [leasing property], it would have done so expressly. *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, . . . 812 A.2d 1218, 1223 ([Pa.] 2002) ('[U]nder the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters.').

*Kegerise v. Delgrande*, 183 A.3d 997, 1005 n.12 (Pa. 2018).

[20] *Senor Appeal* and *Dauphin County General Authority* were decided pursuant to Section 4A(b)(2) of the former Municipality Authorities Act of 1945.

[21] *Para Transit Corp.* was decided pursuant to the former Municipality Authorites Act of 1945.

14

avoid future private rail line abandonment, "a public-private partnership to both take ownership of the rail lines (public) and provide rail operation on the [] rail lines (private)" was necessary. R.R. at 28a. Accordingly, the Authority was created to

> finance, construct or otherwise acquire, purchase, hold, lease or sub-lease, either in the capacity of lessee or lessor, land, rail lines, buildings or other facilities to be devoted wholly or partially for the operation of rail lines, for public uses, or for any other purpose permitted by [the MAA], whether said projects are situated in the Counties of Centre, Columbia, Montour, Northumberland or Union, or elsewhere in the Commonwealth.

R.R. at 28a.

The Authority successfully acquired and rehabilitated 80 miles of Conrail's lines. However, as the RFP reflects: "Despite its authorized public purposes of owning and maintaining the rail lines, **the [Authority's] authorized purposes do not include *operation* of the rail lines**." R.R. at 29a (bold and italic emphasis added). "Therefore, since its formation, the [Authority] has contracted with a private railroad operator for the operation of rail freight service on the [Authority's] rail lines." R.R. at 29a.

Section 5607(b)(2) of the MAA prohibited the Authority from, "in whole or in part[,] [] duplicat[ing] or compet[ing] with *existing* enterprises serving substantially the same purposes." 53 Pa.C.S. § 5607(b)(2) (emphasis added). It is clear from the record that the Authority was formed in 1983 to fill a void where there were no "*existing* enterprises serving substantially the same purposes" of increasing the commerce, health, safety and/or prosperity of Commonwealth residents, and it did not operate the rail lines. *Id*. (emphasis added). Reading, on the other hand, is a for-profit business that did not exist between 1983 and 1990,[22] let alone operate, own or

---

[22] During oral argument, Reading raised for the first time that it was created in May 1983 and, therefore, preexisted the Authority. However, the record belies that argument as, in its

maintain rail lines or extend leases to private rail line operators in the counties the Authority serves. Despite that Reading and the Authority may otherwise potentially compete for property, state grant funding and new industry, relative to the specific services covered by the RFP, Reading cannot establish that the Authority will, "in whole or in part [] duplicate or compete with existing enterprises serving substantially the same purposes." Section 5607(b)(2) of the MAA. Therefore, viewing the evidence in a light most favorable to the Authority, as we must, Reading did not set forth a claim against the Authority under Section 5607(b)(2) of the MAA upon which relief may be granted.

In the August 12, 2016 order, the trial court concluded:

There is no legal precedent that supports [Reading's] position that now 42 years after the creation of [the Authority], a private business can challenge its purpose and existence on the basis of a 'competitive enterprise.' . . . *Dominion Products* . . . is clearly inapposite as therein the authority created an enterprise that would have competed with existing enterprises already providing the same services.

The prohibition of [Section] 5607(b)(2) [of the MAA] of anti-competition cannot be stood on its head. [The Authority] had been in existence substantially before [Reading] was incorporated in 1990. At this time, [Reading] can become an operator partner, as to the existing rail lines of [the Authority], if it so qualifies and is selected by [the Authority] after a fair RFP process. On the other hand, [Reading] has no legal basis upon which to proceed under Count [I] of its [C]omplaint. There is no legal basis upon which a declaratory judgment may be entered by this [trial c]ourt to prohibit [the Authority] from leasing [] its lines, receiving state grants, or enhancing its rail assets.

Complaint (*see* ¶ 3, R.R. at 3a), Petition for Preliminary Injunction (*see* ¶ 3, R.R. at 589a), and principal appellate Brief to this Court (at 31-32), Reading declared that it was created in 1990.

16

R.R. at 525a-526a. In its Statement, the trial court explained:

> In this [trial] court's prior order of August 12, 2016, . . . the rationale for rejecting [Reading's] position was set forth succinctly that Section 5607(b)(2) of the [MAA] prohibiting a competitive enterprise applies only to existing companies already providing the same services. Here, [the Authority] was formed several years before [Reading] was even incorporated, [the Authority] filled a void created by the abandonment of rail lines by [Conrail]. It has been held that where an authority's provision of services predates a private entity's provision of a substantially identical service, the statutory limitation of Section 5607(b) [of the MAA] is inapplicable. *See Evansburg Water Co. . . .*

R.R. at 1886a-1887a. Based upon a review of the record, this Court concludes that the trial court properly granted the Authority's demurrer and dismissed Reading's claim that the Authority duplicates or competes with private enterprise in violation of Section 5607(b)(2) of the MAA.

### b. Section 5614(a)(1) of the MAA

In Count II of the Complaint, Reading claimed that the Authority violated Section 5614(a)(1) of the MAA and Section 3911 of the Procurement Code. *See* R.R. at 14a-16a. In the August 12, 2016 opinion, the trial court declared that Section 5614(a)(1) of the MAA is inapplicable here because the Authority's leasing of freight rail line services will not result in the expenditure of public funds. *See* R.R. at 524a n.1. Reading claims that the trial court erred by making that ruling, thereby effectively granting a partial demurrer to Count II of Reading's Complaint. *See* Reading Br. at 37-41. The Authority and Carload respond that the Authority need not award the operating agreement to the lowest responsible bidder because it will be receiving rather than spending money. *See* Authority Br. at 39-46; Carload Br. at 46-48.

Section 5614(a)(1) of the MAA specifies:

> Except as set forth in paragraph (2), **all construction, reconstruction, repair or work of any nature made by an authority** if the entire cost, value or amount, including labor and materials, exceeds a base amount of $18,500[.00], subject to adjustment under subsection (c.1), **shall be done only under contract to be entered into by the authority with the lowest responsible bidder** upon proper terms after public notice asking for competitive bids as provided in this section.

53 Pa.C.S. § 5614(a)(1) (emphasis added).

The MAA does not define "lowest responsible bidder." 53 Pa.C.S. § 5614(a)(1). However, where the MAA's lowest responsible bidder language was applied to a convention center authority's construction contract, this Court explained:

> Drawing up the terms of, and the award of a contract to the 'lowest responsible bidder' involves the exercise of discretion by the contracting authority. *Hibbs v. Arensberg*, . . . 119 A. 727, 729 ([Pa.] 1923) ('The term 'lowest responsible bidder' does not mean the lowest bidder in dollars; nor does it mean that the [municipal authority] may capriciously select the highest bidder regardless of responsibility or cost. What the law requires is the exercise of a sound discretion.'). *Accord Kratz v. City of Allentown*, . . . 155 A. 116, 117 ([Pa.] 1931) ('The statute requires that the municipal contracts be let to the lowest responsible bidder, but the courts have uniformly held that the question of who is the lowest responsible bidder is one for the sound discretion of the proper municipal authority and does not necessarily mean the one whose bid on its face is lowest in dollars, but includes financial responsibility, also integrity, efficiency, industry, experience, promptness, and ability to successfully carry out the particular undertaking.')[.]

*A. Pickett Constr., Inc. v. Luzerne Cty. Convention Ctr. Auth.*, 738 A.2d 20, 24 (Pa. Cmwlth. 1999); *see also Allan Myers, L.P. v. Dep't of Transp.*, 202 A.3d 205 (Pa. Cmwlth. 2019).

The Procurement Code, which "applies to every expenditure of funds . . . by Commonwealth agencies under any contract," 62 Pa.C.S. § 102(a), and, like Section 5614(a)(1) of the MAA, mandates that Commonwealth agency contracts "shall be awarded by competitive sealed bidding[,]"[23] 62 Pa.C.S. § 512(a), and defines a "responsible bidder" as "[a] bidder that has submitted a responsive bid and that possesses the capability to fully perform the contract requirements in all respects and the integrity and reliability to assure good faith performance." 62 Pa.C.S. § 103.

Moreover, the Pennsylvania Supreme Court has declared, regarding the MAA: "The obvious intention of a public competitive bidding requirement is to secure public contracts for the use of the government or a governmental body **at the lowest cost to the taxpayers**."[24] *Willman v. Children's Hosp. of Pittsburgh*, 479 A.2d 452, 456 (Pa. 1984) (emphasis added). Accordingly, this Court concludes that Section 5614(a)(1) of the MAA requires that, when contracting for services, a

_____

[23] Section 512(a) of the Procurement Code requires competitive sealed bidding, "except as otherwise provided in [S]ection 511 [of the Procurement Code] (relating to methods of source selection)." 62 Pa.C.S. § 512(a). Competitive sealed proposals are among the source selection methods listed in Section 511 of the Procurement Code. *See* 62 Pa.C.S. § 511; *see also* Section 513 of the Procurement Code, 62 Pa.C.S. § 513 (relating to competitive sealed proposals).

[24] This Court acknowledges:

> Article III, Section 22 of the Pennsylvania Constitution requires that the General Assembly 'shall maintain by law a system of competitive bidding under which all purchases of materials, printing, supplies or other personal property used by the government of this Commonwealth shall so far as practicable be made.' PA. CONST. art. III, § 22.

*Allan Myers*, 202 A.3d at 211 n.7. However, because that constitutional provision is limited to "purchases of materials, printing, supplies or other personal property used by the government[,]" PA. CONST. art. III, § 22, Pennsylvania courts have ruled that it does not apply to service or real property contracts. *See Pa. Indus. for the Blind & Handicapped v. Larson*, 436 A.2d 122, 124 (Pa. 1981) (Article III, Section 22 of the Pennsylvania Constitution "has no applicability to contracts for services[.]"); *see also Pa. Associated Builders & Contractors, Inc. v. Commonwealth, Dep't of Gen. Servs.*, 996 A.2d 576 (Pa. Cmwlth. 2010) (holding that an agency's use of a competitive sealed proposal, rather than competitive bidding, for a contract for real property construction/renovation did not violate Article III, Section 22 of the Pennsylvania Constitution).

municipal authority must employ a competitive source selection process,[25] whereby the contract is awarded to the most qualified candidate at the lowest cost to the taxpayers.

In the instant matter, relative to candidate qualifications (i.e., responsible bidder), the stated purpose of the Authority's RFP was "to obtain first-class, high-quality [rail freight] operating services" to meet the needs of the customers on the Authority's rail lines. R.R. at 1462a. The RFP declared:

> [T]he [Authority] seeks an operator that will:
>
> - manage and operate the [Authority's] rail lines in a high[-]quality and efficient manner;
>
> - operate the [Authority's] rail lines in a manner so as to enhance rail revenues while ensuring that the [Authority's] railed lines remain economically competitive;
>
> - properly maintain and safeguard the [Authority's] investment in its railroad properties through the exercise of [the] highest standards of maintenance in accordance with [the Authority's] requirements and, where approved by the [Authority], recommend or undertake capital improvements to improve the rail lines;

---

[25] To the extent Reading is challenging the Authority's use of a competitive sealed *proposal* selection process (i.e., an "evaluation method where 'points' were used to evaluate proposals," Reading Br. at 39), rather than competitive sealed *bidding*, the Authority did not err by employing a competitive sealed *proposal* process in which an evaluation committee would award points for valued criteria. Section 513(a) of the Procurement Code provides: "When the contracting officer determines in writing that the use of competitive sealed bidding is either not practicable or advantageous to the Commonwealth, a contract may be entered into by competitive sealed proposals." 62 Pa.C.S. § 513(a). Such "[p]roposals shall be solicited through a request for proposals[,]" 62 Pa.C.S. § 513(b), and "shall be submitted in the format required by the request for proposals." 62 Pa.C.S. § 513(d). "The responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency, taking into consideration price and all evaluation factors, shall be selected for contract negotiation." 62 Pa.C.S. § 513(g). Therefore, when applicable, a request for proposal is an acceptable alternative to competitive bidding. *See Pa. Associated Builders & Contractors, Inc.*

- maximize the economic impact to the central Pennsylvania region and the utilization of rail in the region;

- implement appropriate marketing activities to attract new customers to be served by [the Authority's] rail lines; and

- accomplish all objectives required of the operator in a professional manner, in compliance with best railroad industry practices and applicable laws and ordinances.

R.R. at 27a.

In addition, the Proposed Operating Agreement makes the selected operator responsible for, *inter alia*: providing all railroad operations, including rail freight service, load handling, dispatching, assignments, maintenance, pricing, marketing, sales, and promulgating and adopting rules and regulations (*see* R.R. at 920a-924a); paying any and all taxes, assessments, public utility charges, excise, license and permit fees, sewer rentals and other government charges, and water, gas and electricity arising from its use (*see* R.R. at 917a); providing all personnel, equipment and facilities necessary for its safe and adequate service (*see* R.R. at 918a); maintaining the railroad premises (*see* R.R. at 919a-920a); making voluntary capital improvements, with the Authority's written approval (*see* R.R. at 920a); and conducting certain asset upgrades (*see* R.R. at 957a-960a).[26]

---

[26] Regarding asset upgrades, the Proposed Operating Agreement clarifies:

> The overarching, but not binding, principle guiding the [] Authority's investments in capital projects/upgrades is generally for the [Authority] to purchase materials and the [o]perator to provide the labor and equipment for installation. This approach will allow the [Authority] and the [o]perator to greater impact projects through cost sharing, [] stretching the budget power of each entity and potentially increasing the scope of each project.

R.R. at 957a. It appears from the RFP and the Proposed Operating Agreement that the upgrades are those the Authority intends to undertake as part of its comprehensive five-year strategic plan. *See* R.R. at 896a-897a, 957a-960a.

Accordingly, the Authority requires in RFP Phase 2 that each proposer selected in RFP Phase 1 submit its background information and operations, maintenance, marketing and financial plans, which the Authority will score, and the operating agreement will be awarded to the proposer with the highest RFP Phase 2 score. *See* R.R. at 13a-15a. Thus, the Authority clearly intends to award the operating agreement to the proposer scoring the highest points on the valued criteria (i.e., the most qualified candidate).

Regarding the expenditure of taxpayer funds (i.e., lowest cost to the taxpayers), the RFP declares that "**the selected proposer will have exclusive use of the [Authority's] rail lines** for rail freight services **in exchange for payment of an operating fee** . . . ."[27] R.R. at 33a (emphasis added); *see also* R.R. at 916a (Proposed Operating Agreement at 4). Accordingly, the Authority would not *expend* funds for the selected operator's services under the Proposed Operating Agreement, but would *receive* them.

The MAA does not specifically state that its competitive bidding proviso does not apply where the Authority is seeking to lease its property as a lessor or to procure something at no cost. However, Section 102(a) of the Procurement Code specifies that its competitive bidding mandate "applies to every *expenditure* of funds . . . by Commonwealth agencies under any contract[.]" 62 Pa.C.S. § 102(a) (emphasis added).

Moreover, in *Lasday v. Allegheny County*, 453 A.2d 949 (Pa. 1982), relying upon the language in Section 2001(a) of the Second Class County Code, Act

---

[27] According to the Proposed Operating Agreement, the operating fee shall consist of: (1) a percentage of the operator's gross revenues, or a flat fee, whichever is greater; (2) a percentage of car storage rentals the operator receives; (3) a fee per carload weighed on the Authority's scale; (4) a percentage of the trackage rights the operator will receive from Norfolk Southern; and (5) 50% of any revenue the operator realizes from the sale or assignment of any portion of the railroad premises. *See* R.R. at 962a-963a.

of July 28, 1953, P.L. 723, *as amended*, 16 P.S. § 5001(a), which also contains a lowest responsible bidder limitation,[28] the Pennsylvania Supreme Court ruled that the County was not statutorily obligated to engage in competitive bidding for airport concession leasehold agreements because they did not require the County to expend public funds. The *Lasday* Court reasoned:

> As **the Legislature's use of the phrase 'lowest responsible bidder'** makes clear, [S]ection 2001(a) [of the Second Class County Code] **is addressed to those situations where**, unlike here, **the County is spending public funds and thus should be attempting to secure for the taxpayers the least costly contract**. **Here, as lessor, the County is not spending money, but receiving it**. The 'lowest responsible bidder' requirement is thus manifestly inapposite to this case and, if applied, would lead to the absurd result of requiring the County to award its concession contracts to the concessionaire who [sic] promised to pay the County the least rent and the smallest concession fee. *Compare Bevilacqua v. Clark*, . . . 103 A.2d 661 ([Pa.] 1954) (competitive bidding required for formation of concession contract where statute mandated that 'all concessions . . . shall be awarded . . . only . . . to the highest responsible bidder').

*Lasday*, 453 A.2d at 952 (emphasis added).

Similarly, in *Willman*, the Pennsylvania Supreme Court ruled that, where the county development authority merely provided a channel for private hospital renovation financing, rather than MAA-specified "construction, reconstruction,

---

[28] Section 2001(a) of the Second Class County Code, then provided, in relevant part:

> (a) All contracts or purchases in excess of two thousand five hundred dollars ($2,500[.00]) shall be in writing and, except those hereinafter mentioned, shall not be made except with and from the lowest responsible bidder meeting specifications[.]

16 P.S. § 5001(a) (the threshold amount has since been amended); *see Lasday*, 453 A.2d at 952.

repairs or work of any kind made by [the] authority,"[29] 53 Pa.C.S. § 5614(a)(1), the underlying construction contract need not be awarded to the lowest responsible bidder on a competitive basis.

The *Willman* Court explained, in relevant part:

In the letting of important public contracts for public work, it is generally considered that the interests of the public are best served by submitting such contracts to open competitive bidding. 64 Am.Jur.2[]d § 34, p.886 [(1972)].

The purposes of provisions requiring that contracts with public authorities be let only after competitive bidding are to secure economy in the construction of public works and the expenditures of public funds for materials and supplies needed by public bodies; to protect the public from collusive contracts; to prevent favoritism, fraud, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions; and to promote actual, honest, and effective competition to the end that each proposal or bid received and considered for the construction of a public improvement, the supplying of materials for public use, etc., may be in competition with all other bids upon the same basis, so that all such public contracts may be secured at the lowest cost to taxpayers.

81 A.L.R.3[]d PP. 981-82 [(1977)].

---

[29] *Willman* was decided pursuant to Section 10 of the former Municipality Authorities Act of 1945, 53 P.S. § 312(A), which provided:

All construction, reconstruction, repairs or work of any nature *made by* any [a]uthority, where the entire cost, value or amount of such construction, reconstruction, repairs or work, including labor and materials, shall exceed two thousand five hundred dollars ($2,500[.00]), . . . shall be done only under contract or contracts to be entered into by the [a]uthority with the lowest responsible bidder . . . .

*Willman*, 479 A.2d at 455.

**The contract in question, indeed the entire project, does not involve the use or risk of public funds or public credit**. **None of the costs of construction is borne by the taxpayers**. We do not believe that the legislature intended to require open competitive bidding where an authority merely serves as a financing conduit for an entirely private project. *Compare*: *Clearfie*[*l*]*d Area Hous*[*.*] *Corp. v. Hughes*, . . . 318 A.2d 754 ([Pa. Cmwlth.] 1974). 'The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly[.]'[] [SCA], 1 Pa.C.S.[] § 1921(a). The obvious intention of a public competitive bidding requirement is to secure public contracts for the use of the government or a governmental body at the lowest cost to the taxpayers. In this case[,] we are dealing with a private undertaking at **no cost to the taxpayers**. **The reasons for open competitive bids do not exist**.

*Willman*, 479 A.2d at 455-56 (emphasis added).

Here, in the August 12, 2016 order, the trial court declared that "the reliance by [Reading] on [Section 5614(a)(1) of the MAA] is misplaced[,] as this is not a situation where the Authority is seeking to procure something at a cost to it from the 'lowest responsible bidder'; thus, it is inapplicable and not subject to further analysis." R.R. at 524a n.1. In its Statement, the trial court expounded:

It is contended that [the Authority's] operating agreement was subject to competitive bidding under [Section 5614 of the MAA]. However, [the Authority] was following a stringent process of requests for proposals for operators of the freight lines. The 'lowest responsible bidder' criteria was not required to be selected under these circumstances; thus, as this [trial] court determined, the foregoing statute by its clear language was inapplicable to this situation.[30]

---

[30] The trial court added that Section 5614(a)(1) of the MAA does not apply because the Proposed Operating Agreement "is not a contract for '. . . construction, reconstruction, repair or work of any nature made by the [A]uthority[.]' The lease of railroad lines is obviously not encompassed therein. 53 Pa.C.S. § 5614(a)(1)." R.R. at 1887a. However, to the extent that the Proposed Operating Agreement anticipates the selected operator will undertake voluntary capital improvements and repairs and potential Authority-directed upgrades, it is not clear that the General Assembly's omission of railroad line leases from the MAA's list of contracts that must be competitively bid is what makes that provision inapplicable here. Having determined that Section

25

R.R. at 1887a.

Applying the clear intent of the Procurement Code and the Pennsylvania Supreme Court's reasoning in *Lasday* and *Willman*, this Court agrees with the trial court's August 12, 2016 conclusion that the lowest responsible bidder language in Section 5614(a)(1) of the MAA does not apply where, as here, the Authority would receive rather than expend public funds under the Proposed Operating Agreement.

## 2. Trial Court's October 17, 2018 Orders (Motions)

In overruling the Authority's preliminary objections to Count II of the Complaint, the trial court held:

> With accepting the allegations as true at this stage of the pleadings, [Reading] has alleged improprieties have disadvantaged its proper consideration as a proposer in the RFP process, specifically due to [Authority] conflicts of interests. Complaint [¶] 29. Also, it is alleged that RFP questions were designed to eliminate [Reading] from consideration. Complaint [¶] 35.
>
> . . . . [T]hus, [Reading] may proceed on its claims as to the RFP process.

R.R. at 524a.

Upon the trial court's issuance of its August 12, 2016 order, the only viable issue remaining in the Complaint was Reading's Count II claim that the Authority "unfairly and intentionally excluded [Reading], a responsible and responsive bidder, from submitting an RFP under Phase 2 . . . ." Complaint ¶ 63; R.R. at 16a. In its October 17, 2018 orders, the trial court granted summary judgment in favor of the Authority and Carload because Reading not only failed to produce evidence that the RFP Phase 1 process was unfair or designed to eliminate Reading

---

5614(a)(1) of the MAA does not apply because the Proposed Operating Agreement does not involve the expenditure of public funds, this Court need not analyze that issue.

from consideration, but Reading disqualified itself from consideration and its goal was to privatize the Authority's operation.

Initially, "[t]his Court's review of a trial court order granting summary judgment is limited to determining whether the trial court erred as a matter of law or abused its discretion." *Z & R Cab, LLC v. Phila. Parking Auth.*, 187 A.3d 1025, 1031 n.5 (Pa. Cmwlth. 2018).

> Because appellate review of a trial court ruling on summary judgment motions entails a question of law, our standard of review is *de novo* and our scope of review is plenary. Our Supreme Court has explained the standard of review employed by trial courts reviewing summary judgment motions as follows:
>
>> Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. . . . The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment.
>
> *Starling* [*v. Lake Meade Prop. Owners Ass'n, Inc.*], 162 A.3d [327,] 340 [(Pa. 2017)] (quoting *Gilbert v. Synagro Cent*[.]*, LLC*, . . . 131 A.3d 1, 10 ([Pa.] 2015)).

*Pane v. Indian Rocks Prop. Owners Ass'n, Inc. of Ledgedale*, 167 A.3d 266, 270 n.2 (Pa. Cmwlth. 2017) (citations omitted).

Notwithstanding this Court's conclusion that the "lowest responsible bidder" language in Section 5614(a)(1) of the MAA does not apply to the instant facts, the Authority was nevertheless obligated to conduct a fair competitive proposal process. This Court has explained:

Competitive bidding requirements 'guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of . . . contracts . . . and are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders.' *Yohe v. City of Lower Burrell*, . . . 208 A.2d 847, 850 ([Pa.] 1965) (citation omitted). The intent of competitive bidding statutes is 'to 'close, as far as possible, every avenue to favoritism and fraud in its varied forms.'' *Premier Comp Sol*[*s.*]*, LLC v. Dep*[*'*]*t of Gen*[.] *Serv*[*s.*], 949 A.2d 381, 382 n.1 (Pa. Cmwlth. 2008) (quoting *Louchheim v. Phila*[.], . . . 66 A. 1121, 1122 ([Pa.] 1907)). Bidders for a public contract must be 'on an equal footing' and enjoy the same opportunity for open and fair competition. *Phila*[.] *Warehousing* [*&*] *Cold Storage v. Hallowell*, . . . 490 A.2d 955, 957 ([Pa. Cmwlth.] 1985). Where there is no common standard on which bids are based, '[t]he integrity of the competitive bidding process is violated and the purpose of competitive bidding is frustrated.' *Ezy Parks* [*v. Larson*], 454 A.2d [928,] 932 [(Pa. 1982)]. Thus, when the actual 'procedures followed emasculate the benefits of [competitive] bidding, judicial intervention is proper.' *Id.*[*; s*]*ee also Conduit* [*&*] *Found*[.] *Corp*[.] *v. City of Phila*[.], . . . 401 A.2d 376, 379 ([Pa. Cmwlth.] 1979) ('[T]he courts will not condone a situation that reveals a clear potential to become a means of favoritism, regardless of the fact that the . . . officials may have acted in good faith in the particular case.').

*Allan Myers, L.P.*, 202 A.3d at 211.

Section 513 of the Procurement Code, concerning competitive sealed proposals, provides:

**(a) Conditions for use.--**When the contracting officer determines in writing that the use of competitive sealed bidding is either not practicable or advantageous to the Commonwealth, a contract may be entered into by competitive sealed proposals.

**(b) Request for proposals.--**Proposals shall be solicited through a request for proposals.

. . . .

**(d) Receipt of proposals.--**Offerors shall submit their proposal to ensure that their proposals are received prior to the time and date established for receipt of the proposals. Proposals shall be submitted in the format required by the request for proposals. Proposals shall be opened so as to avoid disclosure of their contents to competing offerors.

**(e) Evaluation.--**The relative importance of the evaluation factors shall be fixed prior to opening the proposals. A Commonwealth agency shall invite its comptroller to participate in the evaluation as a nonvoting member of any evaluation committee. No individual who has been employed by an offeror within the preceding two years may participate in the evaluation of proposals.

**(f) Discussion with responsible offerors and revision of proposals.--**As provided in the request for proposals, discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining best and final offers. Responsible offers shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. In conducting discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors.

**(g) Selection for negotiation.--**The responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency, taking into consideration price and all evaluation factors, shall be selected for contract negotiation.

62 Pa.C.S. § 513.

Section 513 of the Procurement Code expressly authorizes an agency to discuss submissions and to negotiate and ultimately select only "responsible offerors." 62 Pa.C.S. § 513(f), (g). Section 103 of the Procurement Code defines a "responsible offeror" as "[a]n offeror that has submitted a responsive proposal and that possesses the capability to fully perform the contract requirements in all respects . . . ." 62 Pa.C.S. § 103. A "responsive proposal" is one "which conforms in all

material respects to the requirements and criteria in the request for proposal." 62 Pa.C.S. § 103; *see also Allan Myers, L.P.*

> Further,
>
> Section 513 of the [Procurement] Code does not provide 'rigid, detailed procedure or strict requirements for the [request for proposal] process, but preserves a great deal of agency discretion, including discretion to determine agency needs in preparation of [request for proposal] requirements.' *Stanton-Negley Drug Co*[.] *v. Dep't of Pub. Welfare*, 943 A.2d 377, 387 (Pa. Cmwlth. [2008]) . . . . Moreover, . . . '[a]n agency is not required to issue a[] [request for proposal] with terms and conditions that all entities in a particular field can meet[.]' . . . *Id*.

*Pepco Energy Servs., Inc. v. Dep't of Gen. Servs.*, 49 A.3d 488, 491-92 (Pa. Cmwlth. 2012). This Court acknowledges:

> [T]he mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.

*Am. Totalisator Co., Inc. v. Seligman*, 414 A.2d 1037, 1041 (Pa. 1980) (quoting *Blumenschein v. Pittsburgh Hous. Auth.*, 109 A.2d 331, 335 (Pa. 1954)).

> [T]he burden of proving that the discretion of those authorities who set the terms of the bid and award the contract was abused is on the one asserting such a proposition. For the law in this Commonwealth is that public
>
>> officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such considerations and their decisions reached in a legal way after an investigation. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden;

> courts can and will interfere only when it is made apparent this discretion has been abused.

> *Wilson v. City of New Castle*, . . . 152 A. 102, 104 ([Pa.] 1930).

*A. Pickett Constr., Inc.*, 738 A.2d at 24.

### a. Extraneous Factors

Reading argues that the trial court erred by granting the Motions on the basis of extraneous factors that are irrelevant as a matter of law. In particular, Reading takes issue with the trial court's declarations in the October 17, 2018 orders that Reading "was not attempting to be a cooperative bid award winner as its goal was to privatize the subject railroad lines of operation." R.R. at 1874a, 1876a. Reading also challenges the portions of the trial court's Statement that "[Reading] was clearly and admittedly never interested in becoming a cooperative bid award winner. The challenge to the bidding process was simply to delay an award to other interested parties[,]" R.R. at 1887a, and that "[the Authority] had a legitimate expectancy that it would engage a qualified operator with goals consistent with its own objectives." R.R. at 1888a.

Reading contends that the trial court abused its discretion by considering whether Reading was attempting to be a cooperative bid award winner, whether Reading shared the Authority's political beliefs, and whether Reading would submit a proposal if the Authority issued a new RFP, because those factors are irrelevant to whether the Authority's RFP process was biased and fundamentally flawed, and were not part of the scored criteria.

Although perhaps dispositive of whether Reading would have been a good fit if selected as the Authority's operator, such factors are not relevant to whether the Authority "unfairly and intentionally excluded [Reading] . . . from

31

submitting an RFP under Phase 2 . . . " three years earlier.[31]  Complaint at 15; R.R. at 16a.  Accordingly, the trial court erred by relying on these factors when granting the Motions.  However, in light of this Court's conclusions herein, the error was harmless.

**b. Financial Submission**

Reading asserts that the trial court erred by granting the Motions on the basis of Reading's Phase 1 financial submission.  Reading specifically claims that "[f]inancial details were unnecessary and designed to knock out [of RFP Phase 1] independent companies that would be uncomfortable disclosing details to 20 people." Reading Br. at 43.

"It is well[ ]settled that specifications in a[] [request for proposal] are generally mandatory and must be strictly followed."  *JPay, Inc. v. Dep't of Corr.*, 89 A.3d 756, 766 (Pa. Cmwlth. 2014).  Only

> where the requirements in a[] [request for proposal] are not mandated by statute and the [request for proposal] reserves the right to waive defects,[32] [may] a non-compliant submission [] be waived, accepted or cured if: (i) the effect of the waiver will not deprive the agency of the assurance that the contract will be entered into and performed; and (ii) the waiver will not confer a competitive advantage on the offeror over other offerors.

*JPay, Inc.*, 89 A.3d at 766.

In RFP Section XII, "PHASE 1 (RFQ): SPECIFIC INFORMATION REQUIRED FROM PROPOSERS," the Authority mandated that the proposers supply information in

---

[31] Because complete transcripts of Michel's and Reading's Vice President Dennis Shaffer's depositions were not made a part of the record before this Court, it is unclear whether the Authority was aware of Reading's intentions before the RFP process was instituted or while it was ongoing.

[32] In the RFP, "[t]he Authority reserve[d] the right to waive *minor* defects in any response or proposal."  R.R. at 43a (emphasis added).

the following categories: (1) Approach to Operations; (2) Qualifications and Experience; (3) Financial Capability; and (4) Effect of Other Operations on the Authority's Lines. *See* R.R. at 37a-38a. The RFP further explained that each RFP Phase 1 proposer would receive a score between 0 and 20 points for Categories 1, 2 and 3, and points would be deducted based on the conflicts listed relative to Category 4. *See* R.R. at 39a. The Authority intended to then invite the proposers with the three highest scores (or more in the event of a tie) to participate in RFP Phase 2. *See* R.R. at 38a-39a.

Specifically, as part of its Financial Capability submission, each proposer was to provide financial records, including audited financial statements, balance sheets, income and expense statements for the prior three years, plus its last federal income tax return, a credit report, and most recent quarterly financial statement. *See* R.R. at 38a, 1327a-1328a. RFP Section XII articulated: "Failure to adhere to [the RFP Phase 1] requirements may be cause for rejection of the proposal as non-responsive." R.R. at 37a. In RFP Section XIII, "PHASE 1 (RFQ): SELECTION CRITERIA TO BE USED BY THE AUTHORITY," the Authority again declared: "Failure to comply with the [RFP Phase 1] instructions [] may result in the proposal being deemed non-responsive and may, at the discretion of the [Authority], be eliminated from further consideration." R.R. at 38a.

Reading, Carload, Susquehanna, Genesee & Wyoming (G&W) and Northern submitted RFQ responses as part of RFP Phase 1. Despite Reading's pronouncement that "it complied with all of the [Authority's] requirements and timely submitted a[n] RFQ [response] in accordance with [the Authority's] RFP requirements," Complaint ¶ 33; R.R. at 9a, Michel admitted that Reading did not submit any of the required financial records with its RFP Phase 1 response. *See* R.R. at 1328a. Rather, Reading only produced a letter prepared by its accountant (Accountant) purportedly reflecting that Reading "w[as] more than financially

33

qualified[,]" and extended an invitation to two Authority representatives[33] to inspect the relevant documents at Reading's office. R.R. at 1021a.

The proposers' raw scores were as follows:[34]

| Proposer | Approach to Operations | Qualifications & Experience | Financial Capability | **Total** (less Cat. 4 deductions) |
|---|---|---|---|---|
| Carload | 178 | 188 | 172 | 532 |
| Susquehanna | 180 | 179 | 167 | 516 |
| G&W | 148 | 167 | 149 | 437 |
| Northern | 140 | 132 | 173 | 437 |
| Reading | 167 | 168 | 67 | 396 |

*See* R.R. at 877a, 1026a-1188a. Due to the third-place tie between Northern and G&W, they, along with Carload and Susquehanna, were invited to participate in RFP Phase 2. Because Reading's score was not among the three highest, it was the only proposer the Authority did not invite to participate in RFP Phase 2.

Reading was clearly among the top three scorers in the Approach to Operations and Qualifications & Experience categories. Reading lost significant Financial Capability points because it only submitted the letter from its Accountant. The Authority's 10 scoring members awarded Reading the following Financial Capability scores: 17, 16, 15, 12, 4, 3, 0, 0, 0 and 0. *See* R.R. at 878a, 1044a, 1058a, 1082a, 1091a, 1109a, 1115a, 1143a, 1154a, 1163a, 1188a. The scorers' comments included: "No . . . credit [report] or financials[,]" R.R. at 1110a; "Only opinion letter

---

[33] The invitation was limited to Authority consultant Dan Mazur and Authority Executive Director Jeff Stover, neither of whom were Authority Board members.

[34] After Reading challenged the Authority's RFP Phase 1 scoring methodology, the Authority prepared a "Clarification to the RFP," wherein it declared the scoring method would be by ranked score (i.e., the highest raw scorer is awarded 5 points, the second highest is given 4 points, the third highest receives 3 points, and so on). *See* R.R. at 1514a, 1674a-1675a. Upon Reading's objection to the timing of the changed scoring method, and the Board's failure to adopt or ratify the ranked method, the Authority ultimately employed its original raw scoring method. *See* R.R. at 1671a-1682a. Notwithstanding, since the ranked scores would have been: Carload – 43, Susquehanna – 43, Northern – 23, G&W – 22, and Reading – 22, only Carload, Susquehanna and Northern would have advanced to RFP Phase 2. *See* R.R. at 1227a-1228a.

from [Accountant] attached – no detailed financials.  Response not compliant with request[,]" R.R. at 1082a; "Did not provide details[,]" R.R. at 1091a; "Letter from [A]ccountant is a small start; need trends and ratios . . . [Accountant] letter doesn't address . . . [,]" R.R. at 1115a; "Not provided.  Just letter from accounting firm.  Unclear[,]" R.R. at 1142a-1143a; "0 points for lack of complying with requests.  Information withheld.  Will make available at their [sic] offices[,]" R.R. at 136a-1164a; "Not provided . . . on claim of 'proprietary.'  Statement by [a]uditor . . . not substantive."  R.R. at 1187a-1188a.

Among Reading's reasons for not submitting the required financial documents was that it is a private company that should not have to supply such confidential information.[35]  However, the Authority recognized that the requested documents may contain confidential and proprietary information and resolved to protect it.  In RFP Section XI, "PHASE 1 AND PHASE 2 OF RFP: GENERAL INSTRUCTIONS FOR ALL PROPOSALS," R.R. at 36a, the Authority directed the proposers to submit an extra copy of their submissions with confidential and proprietary information redacted, to be used to respond to requests made pursuant to the Right-to-Know Law.[36]  In RFP Section XVII, "PROPOSAL OWNERSHIP AND CONFIDENTIALITY," R.R. at 42a, and Section 22 of the Proposed Operating Agreement, the Authority acknowledged that it required the proposers to include potentially proprietary and/or confidential information.  The Authority instructed the proposers to designate such information, and it agreed, to the extent possible under the law, to hold such records and information in strict confidence.  *See* R.R. at 42a, 927a-928a, 1307a.

---

[35] According to the record, Carload, Susquehanna and Northern are private companies and supplied the requested financial documents.  *See* R.R. at 1307a, 1319a.  Only G&W is a publicly traded company.  *See* R.R. at 1319a.

[36] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

Reading further declares that the Accountant letter and its offer to make the financial documents available for examination should have been sufficient to satisfy the mandatory RFP Phase 1 requirement. The Authority, in its discretion, determined otherwise. According to Walls, the Financial Capability category was included in the RFP Phase 1 because

> it was extremely important for the [Authority] to be . . . confident that the capability was there for the rail operator to sustain [itself] given the normal variability of economic conditions and unforeseen things that would happen . . . . [T]here was a need to make sure that there was a financial capability . . . to withstand those kinds of forces.

R.R. at 1302a. Authority member John Spychalski testified that "without adequate financial information, a [party] cannot make an informed business judgment of the performance and capability . . . and the management of the business entity -- to which those statements relate." R.R. at 1319a. Authority member Stephen Bridy represented that the financial data was necessary to determine whether the proposers were "financially solvent" and could "withstand troubled waters." R.R. at 1343a.

Authority consultant Dan Mazur (Mazur) stated that the requested documentation was general, but was necessary to determine whether a proposer would "have the financial wherewithal to provide . . . the working capital to run the business." R.R. at 1312a. In his expert report to the Authority, Mazur opined that "[i]t [was] entirely appropriate and necessary for the [Authority] to have required proposers to provide financial information . . . in Phase 1 of the RFP. That information is relevant to the needs of the procuring organization . . . partnering with a successful proposer, and it is appropriate for the Board members to factor into their scoring a failure to provide such information." R.R. at 1346a. The record supports

36

that the Authority's request for the proposers' financial records was reasonable.[37] Accordingly, the Authority properly exercised its discretion in determining its needs when preparing the RFP.

The Authority was not obliged to issue the RFP with only terms and conditions that all of the proposers could or would meet. *Pepco Energy Servs., Inc.* "[Reading] knew the [four] criteria for selection and their order or importance before submitting its proposal, just like all the other offerors and they were all on equal footing and received fair and equal treatment." *Language Line Servs., Inc. v. Dep't of Gen. Servs.*, 991 A.2d 383, 389 (Pa. Cmwlth. 2010). Reading was the only proposer that refused to produce the required financial documentation in response to RFP Phase 1. The defect was nonwaivable, because it deprived the Authority of the assurance that Reading could have performed under the Proposed Operating Agreement. *JPay, Inc.* The Authority could have rejected Reading's response as non-responsive but, instead, scored it accordingly.

> The trial court concluded:
>
> When asked to submit financial capability documents along with the others, [Reading] refused to do so, resulting in its disqualification . . . .
>
> . . . .
>
> One seeking review of a RFP process should at the very least attempt to first comply with the requirements, not intentionally refuse to submit documentation . . . .
>
> . . . . The appeal should be denied.

R.R. at 1887a-1888a. Because it did not override or misapply the law, and its judgment was reasonable and not the result of partiality, prejudice, bias or ill will, the trial court did not err as a matter of law or abuse its discretion by granting the

---

[37] The complete transcripts of these depositions were not made a part of the record before this Court.

Motions on the basis of Reading's RFP Phase 1 financial submission. *CenturyLink Pub. Commc'ns, Inc. v. Dep't of Corr.*, 109 A.3d 820 (Pa. Cmwlth. 2015).

### c. Sufficiency of Evidence

Lastly, Reading contends that the trial court erred by finding that Reading did not adduce sufficient evidence that the RFP process was improper, unjust or failed to comply with basic fairness standards. The Authority retorts that the RFP Phase 1 process applied equally and was neutral to all responding proposers, and Reading disregards that it scored the lowest of the RFP Phase 1 respondents because it refused to produce its financial documents. *See* Authority Br. at 1. Carload argues that the record evidence demonstrates that Reading's failure to advance to RFP Phase 2 was due to Reading's noncompliance rather than bias or bad faith. Carload Br. at 13.

In the Complaint, Reading asserted, in relevant part: in forming the OAC, the Authority allowed members with conflicts of interest to make up the majority; only OAC members would assign points and the Board's role was to ratify the OAC's decision; the scoring and selection process was conducted in secret; the OAC designed the process by which Susquehanna was in a position to gain favorable scores because it controlled the operation, and OAC members would fear retaliation; the Board did not develop a new voting procedure after customer members who created the system recused themselves; the questions relative to pending, threatened, or concluded litigation, public-private partnerships, and potential future conflicts of interest were designed to eliminate Reading from RFP Phase 2 consideration; without Reading, the OAC, the Authority and the Board cannot determine which bidder would provide the most revenue, construction, reconstruction and maintenance; by excluding Reading, the Authority and the Board violated the MAA and the Procurement Code by failing to act as fiduciaries to the taxpayers' detriment. *See*

R.R. at 8a-16a. Reading had the burden of proving these claims. *A. Pickett Constr., Inc.*

In response to the Complaint, the Authority admitted that the preexisting OAC developed the RFP process and "initially worked toward creating the RFP here at issue, which was presented to the entire [] Board for approval, during a public meeting, in May [] 2014." R.R. at 534a. The Authority also admitted that the OAC chair and half of the OAC members were employed or had ownership stakes in businesses that ship or receive freight on the Authority's rail lines, but they recused themselves from the RFP scoring process. *See* R.R. at 534a-535a. In addition, the Authority stated that the RFP Phase 1 scoring process was clearly outlined in the RFP and the scoring members complied with it. The Authority further explained that four proposers (rather than three) were advanced to RFP Phase 2 because, as the RFP instructions represented, more than three proposers would advance to RFP Phase 2 in the event of a tie. Finally, the Authority pronounced that the RFP Phase 1 criteria were applied equally to all of the proposers, and Reading's low score was the direct result of Reading's refusal to submit all of the required RFP Phase 1 documentation, rather than any purported unfairness in the RFP process.

The Authority is entitled to a presumption that it legally conducted the RFP process unless Reading proved otherwise. *A. Pickett Constr., Inc.* Moreover, the Authority represented in the RFP that one of its guiding principles is to "[e]xercise ethical procurement standards and procedures[.]" R.R. at 30a.

Based upon this Court's review of the record, Reading proposed to the Authority that, to avoid potential conflict of interest litigation, the Authority should "remove all shipper/customers from Board consideration of the RFQ and RFP process[, and] allow all remaining Board members to have an equal vote in the RFQ and RFP process[.]" R.R. at 1350a. Thereafter, the conflicted Board members

recused themselves from the process and, just as Reading requested, the remaining Board members voted.

The RFP clearly represented as to Phase 1 that "[t]he proposers receiving the top three scores (which may, in the event of a tie, be more than three proposers) will advance . . . [to RFP] Phase 2." R.R. at 38a. Further, after Reading objected to the Authority's brief consideration of using a ranked scoring method (which likewise would have put Reading out of RFP Phase 2 participation), the Authority proceeded with its initial raw scoring method.

In response to the RFP, Reading again sought to drive the RFP process by making its financial information available for review to two specified Authority representatives at Reading's office, rather than providing it to all of the scoring members as the RFP specified. When the Authority declined, Reading supplied nothing more than its Accountant's letter. Although all of the scoring members reasonably could have assessed Reading a "0" point value for its Financial Capability submission, Reading nevertheless received 67 points in that category. Notably, with only another 41 Financial Capability points, Reading could have advanced to RFP Phase 2 with the other proposers.

The record supports that all of the RFP Phase 1 proposers were subject to the same requirements. They were all mandated to submit the same documentation and information, including litigation history and conflicts, which the Authority had the discretion to request. Reading has not proven that the RFP process was improper, unjust or failed to comply with basic fairness standards. Reading's elimination during RFP Phase 1 was not due to any Authority bias or intentional effort to exclude it but, instead, was based on its low score attributable to its refusal to provide financial documentation. Reading did not establish that the OAC knew while drafting the RFP that Reading would refuse to offer that information.

40

After reviewing Reading's evidence, the trial court granted the Motions. In its Statement, the trial court explained:

> [Reading] could not produce any evidence that it was being treated unfairly in the RFP process.
>
> There was a complete opportunity afforded to [Reading] to advance the position that the RFP was improper or unjust. [Reading] never supported with competent evidence its claims in this regard. Thus, it was proper for this [trial] court to dismiss the action to let [the Authority] proceed to award a lease to a responsible entity.

R.R. at 1887a-1888a.

Because it did not override or misapply the law, and its judgment was reasonable and not the result of partiality, prejudice, bias or ill will, the trial court did not err as a matter of law or abuse its discretion by granting the Motions on the basis of Reading's failure to produce sufficient proof that the Authority violated basic fairness standards in the RFP process. *CenturyLink Pub. Commc'ns, Inc*.

## Conclusion

Based upon the foregoing, the trial court's August 12, 2016 order sustaining the Authority's objection to Count I and, in effect, sustaining a portion of the Authority's objection to Count II of Reading's Complaint is affirmed.

The trial court's October 17, 2018 orders granting the Motions are affirmed.

The Application to Strike is granted.

_____
ANNE E. COVEY, Judge

41

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Blue Mountain and Northern : 
Railroad, : 
                     Appellant : 
                      : 
           v. : 
                      : 
Seda-Cog Joint Rail Authority and : 
Board of Seda-Cog Joint Rail Authority, : 
Susquehanna Union Railroad Company, :   No. 1627 C.D. 2018
and Carload Express, Inc. :   No. 1628 C.D. 2018

## O R D E R

AND NOW, this 6th day of July, 2020, the Northumberland County Common Pleas Court's (trial court) October 17, 2018 orders granting Carload Express, Inc.'s (Carload) Motion for Summary Judgment and the Seda-Cog Joint Rail Authority's and Board of Seda-Cog Joint Rail Authority's (collectively, Authority) Motion for Summary Judgment are AFFIRMED.

The Authority's Application in the Nature of a Motion to Strike Reading Blue Mountain and Northern Railroad's Untimely Reply Brief, in which Carload joined, is GRANTED.

 

 

_____
ANNE E. COVEY, Judge